IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. _____

| | | |
|---|---|---|
| STEPHEN R. PORTER, PH.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF TRUSTEES OF NORTH | ) | |
| CAROLINA STATE UNIVERSITY, W. | ) | |
| RANDOLPH WOODSON, MARY ANN | ) | |
| DANOWITZ, JOY GASTON GAYLES, | ) | **COMPLAINT AND JURY** |
| JOHN K. LEE, AND PENNY A. | ) | **DEMAND** |
| PASQUE, individually and in their | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Plaintiff Stephen R. Porter Ph.D., by and through counsel, hereby states as follows:

## INTRODUCTION

1.      The Supreme Court of the United States has made clear that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 462 U.S. 138, 142 (1983). That includes a public employee's right to speak "as a citizen upon a matter of public concern." *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir.

1998). Yet in retaliation for Professor Stephen Porter's protected expressions of opinion on important societal issues, Defendants have intentionally and systematically excluded him from departmental programs and activities that are necessary for him to fulfill his job requirements, effectively hollowing his job out from the inside. They have done this in a deliberate effort to set the stage for his eventual termination.

2.      While the structure of Plaintiff's academic department – and thus, the details of the adverse employment actions taken against him – is complex, what is happening is quite simple: Defendants are gradually forcing Plaintiff into what is effectively a "rubber room" in retaliation for his criticisms of the so-called "social-justice" ideology that now prevails both in his department and in academia more broadly.

## JURISDICTION AND VENUE

3.      This action arises under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988.

4.      This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. § 2201-02; and costs and attorneys' fees under 42 U.S.C. § 1988.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and/or all of the acts described in this

Complaint occurred in this district.

## PARTIES

6.      Plaintiff Stephen R. Porter is a tenured professor in the Department of Educational Leadership, Policy, and Human Development ("ELPHD") within the College of Education at North Carolina State University, a position he has held since 2011.

7.      Defendant Board of Trustees of North Carolina State University ("the Board") is the 13-member governing body of North Carolina State University ("NCSU"), a governmental entity, and is responsible for the administration of NCSU, including but not limited to NCSU's compliance with laws, rules, regulations, and requirements. At all times relevant to this complaint, the Trustees of the Board acted under color of state law and are sued in their official capacities.

8.      Defendant W. Randolph Woodson is the Chancellor of NCSU. He is sued in his official capacity.

9.      Defendant Mary Ann Danowitz is the Dean of the College of Education at NCSU. Defendant Danowitz was instrumental in removing Plaintiff from his departmental Program Area in retaliation for his protected speech and in punitively assigning him a fifth course to teach. Defendant Danowitz acted under color of state law and is sued in both her official and individual capacities.

10.     Defendant Joy Gaston Gayles is a professor and Program Coordinator in ELPHD. Defendant Gaston Gayles was instrumental in excluding Plaintiff from doctoral events and activities critical to the fulfillment of his job duties. Gaston

Gayles also developed a new ELPHD Ph.D. Program Area of Study in "Higher Education Opportunity, Equity, and Justice" but excluded Plaintiff from this new Program Area of Study because of his viewpoints. This action was intended to eliminate Plaintiff from participation in doctoral activities in ELPHD altogether. Defendant Gaston Gayles acted under color of state law and is sued in both her official and individual capacities.

11.     Defendant John K. Lee has been the head of ELPHD since August 2019. Throughout his tenure as Department Head, Defendant Lee has systematically excluded Plaintiff from meetings and activities related to the Higher Education doctoral program, including the advising of Ph.D. students. This has severely hampered Plaintiff's ability both to perform his duties as a current advisor to Higher Education Ph.D. students and his ability to recruit new advisees. These are essential elements of Plaintiff's job without which his future at NCSU is in jeopardy. Defendant Lee acted under color of state law and is sued in both his official and individual capacities.

12.     Defendant Penny A. Pasque was, until July 2019, the head of ELPHD. In July 2019, following significant controversy over a personal blog post Plaintiff wrote criticizing the increased focus on social justice in the field of higher education, Defendant Pasque removed Plaintiff from his departmental Program Area and assigned him to teach a fifth course in retaliation for his protected speech. Defendant Pasque acted under color of state law and is sued in both her official and individual capacities.

## FACTS

13.     NCSU hired Plaintiff as a tenured professor in ELPHD in 2011 to teach graduate-level statistics and research methods courses in the College of Education. ELPHD is located within NCSU's College of Education ("CED"). At the time of his hire, Plaintiff joined the Higher Education Program Area within ELPHD – aimed at students pursuing careers in post-secondary education – because of his prominence in the field of post-secondary research.

14.     The organizational structure of ELPHD is complex but must be fully explained in order to understand the circumstances giving rise to this action.

15.     Plaintiff has remained a member of the Higher Education Program Area, one of several degree program areas within ELPHD, throughout his tenure at NCSU. ELPHD offers two degrees in Higher Education: a Master's and a Ph.D., with no undergraduate students. Plaintiff has had limited involvement with the Master's program during his time at NCSU. He has no Master's advisees and does not attend events related only to the Master's degree.

16.     In 2015, CED faculty voted to create a college-wide Ph.D. program called the Scholar Leader Ph.D. While each Ph.D. program in CED would have its own program-specific courses, all Ph.D. programs within CED would now have common research methods courses and common Scholar Leader courses, taken by all CED Ph.D. students.

17.     As part of the change to the Scholar Leader program, all Ph.D. degree programs are now located within a Ph.D. Program Area of Study ("PAS") – a

category distinct from the Program Areas. In theory, this created two separate tracks, with Master's degrees and certificates located within the original ELPHD Program Areas, and all Ph.D. programs located within the new Ph.D. Program Areas of Study, with possibly differing groups of faculty in each track. In practice, however, ELPHD ignored these new distinctions and continued to address both Master's and Ph.D. matters within the original Program Areas.

18.     Prior to the adverse employment actions imposed upon Plaintiff, Plaintiff spent considerable time on Higher Education Ph.D. activities. Some of these activities include taking on Higher Education Ph.D. advisees every year; serving on Higher Education Ph.D. committees; actively recruiting prospective Ph.D. students through email, phone calls and personal meetings; taking part in the Ph.D. admissions review process; taking part in the annual Open House and Recruitment Weekend activities; reviewing and discussing multiple Diagnostic Advisement Procedure papers (submitted by all 2nd-year doctoral students) and multiple dissertation prospectuses (submitted by all doctoral students in lieu of a comprehensive exam); and engaging in additional activities to help Higher Education doctoral students.

19.     In recent years, Plaintiff has been outspoken about his concern with how the focus on so-called "social justice" is affecting academia in general, and about his concern that the field of higher education study is abandoning rigorous methodological analysis in favor of results-driven work aimed at furthering a highly dogmatic view of "diversity," "equity," and "inclusion."

20.     At a department meeting in Spring 2016, for example, Plaintiff expressed his concerns with a proposal by the CED's Council on Multicultural and Diversity Issues to add a question on diversity to student course evaluations.

21.     To be clear, Plaintiff does not oppose, and in fact supports, the increased recruitment of qualified faculty and students of color in his academic field. But this is not what "diversity" now means in the College of Education.

22.     The proposal was presented at an ELHPD department meeting by Teaching Associate Professor Valerie Faulkner. Citing the validity standards of the American Educational Research Association, Plaintiff asked Faulkner about what work had gone into the design of the question. Survey methodology is one of Plaintiff's areas of research, and he was concerned that in response to social pressure, the department was rushing to include a question that had not been properly designed and thus might be harmful to faculty without yielding useful information.

23.     The discussion was amicable in tone, although perhaps embarrassing for Faulkner, as it became apparent that the Council had created the new question about diversity without consideration or testing for validity and reliability.

24.     However, the incident was later referenced in a departmental "Climate Check Report" conducted by NCSU's Office for Institutional Equity and Diversity (OIED) in May 2017 that labeled Plaintiff as a "bully."

25.     Defendant Penny Pasque became the new ELPHD department head at the beginning of the 2017–2018 academic year. Her biography indicates that she is

committed to and focused upon social justice. She is also involved with the Association for the Study of Higher Education (ASHE) and was named as editor of ASHE's research journal in 2019.

26.     On November 2, 2017, Defendant Pasque came to Plaintiff's office for what she described as a "get to know you" meeting. Defendant Pasque took the opportunity to inform Plaintiff that some colleagues had described him as a "bully" in the departmental Climate Study conducted the previous spring by the OIED.

27.     Yet when asked, Defendant Pasque provided just one example of Plaintiff's alleged bullying – the discussion of the diversity question at the Spring 2016 department meeting.

28.     Plaintiff told Defendant Pasque that he believed asking about survey methods during a meeting at a major research university could not qualify as bullying. Defendant Pasque implied that there were other claims about Plaintiff in the Climate Study, but she did not identify any and refused to describe them, citing the confidential nature of the Climate Study.

29.     On January 22, 2018, seemingly out of the blue, Plaintiff received an email from Defendant Pasque that restated the concern about so-called "bullying" she expressed at their November 2, 2017 meeting and invited Plaintiff to respond.

30.     Defendant Pasque's email alarmed Plaintiff because she seemed to be trying to establish a paper trail of problematic behavior on his part – behavior that was, in reality, nothing more than doing his job.

31.     At that time, Plaintiff asked Defendant Pasque whether a copy of the

Climate Study was in his personnel file, and she responded that it was not.

32.     In 2019, Plaintiff requested a copy of his personnel file from NCSU. He was astonished to discover a copy of Defendant Pasque's January 22, 2018 email concerning bullying in his personnel file. Someone at the University had placed a copy in his file without notifying him.

33.     On April 11, 2018, Inside Higher Ed published an article about a faculty search committee chaired by Alyssa Rockenbach, a colleague of Plaintiff's in the Higher Education Program Area.

34.     In the article, anonymous faculty at NCSU complained that Terrell Strayhorn was one of the finalists for the position. Strayhorn was a former professor at The Ohio State University ("OSU") who was accused of using OSU staff to run his side business giving speeches across the country, neglecting his professorial duties to focus on his business, and having an inappropriate relationship with a student. He was terminated from his center director position at OSU, forced to resign his tenured professor position, and paid OSU $29,000 as part of an agreement to leave the university.

35.     According to the article, Rockenbach conducted the search with "unusual secrecy": for the first time in CED history, resumés for the candidates were shielded from faculty review.

36.     Plaintiff was concerned that Rockenbach cut corners on her vetting of Strayhorn, who is Black, out of a desire to hire a Black scholar whose work focused on racial issues, tying into Plaintiff's broader concern about the abandonment of

rigor in pursuit of a particular vision of social justice even if that meant condoning apparent sexual misconduct.

37.     When the article broke on April 11, 2018, Plaintiff sent the following email to the Higher Education faculty:

> Did you all see this?
>
> http://www.insidehighered.com/news/2018/04/11/anonymous-faculty-members-nc-state-object-job-candidate-who-was-ousted-ohio-state
>
> This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work, Alyssa!

38.     A week later, on April 19, 2018, Defendant Pasque requested a meeting with Plaintiff about his email, at which she repeatedly asked him what his intent was in sending it. In light of the email he had received from Defendant Pasque on January 22, 2018, Plaintiff repeatedly asked Defendant Pasque to explain her specific concerns with the email, which she avoided.

39.     After the meeting, Plaintiff filed a Public Records request to gain a better understanding of the situation, because he was increasingly concerned about the hostility towards him within the department.

40.     He learned that:

a.      On April 11, 2018, Defendant Gaston Gayles forwarded Plaintiff's email to Defendant Pasque, saying "NOT COOL!!!! I am so mad about all of this I could scream!! I can't stay silent about this. It's maddening!" Defendant Pasque's response was completely redacted.

b.   That same day, Rockenbach forwarded Plaintiff's email to Defendants Pasque and Danowitz, and Robinette Kelley, Associate Vice Provost for Equal Opportunity and Equity. At some point Plaintiff's email was also forwarded to Vice Provost for Faculty Affairs Katherine Stewart.

41.   At a follow-up meeting with Plaintiff on April 24, 2018, Defendant Pasque made it known that she had spoken with the administration to find ways to exclude Plaintiff from critical aspects of his job. Specifically, she inquired whether Plaintiff had to remain a member of the Higher Education Program Area or whether he could be a member of the department without a Program Area, a move that would severely marginalize Plaintiff within the department.

42.   This was the first time Defendant Pasque mentioned her desire to eliminate Plaintiff from the Higher Education Program Area.

43.   Because ELPHD still used the Program Area designation to describe both its Master's and Ph.D. programs, see *supra* ¶17, Pasque was effectively proposing to exclude Plaintiff from all Higher Education activities, both Master's and doctoral.

44.   Plaintiff was astonished and dismayed. He told Defendant Pasque that he did not understand why she was pursuing this idea.

45.   Plaintiff left the meeting deeply disturbed. Defendant Pasque seemed intent on driving Plaintiff out of the Higher Education Program Area, and Plaintiff felt that she was pressuring him to leave.

46.   Plaintiff's annual evaluation that year was good, save for a vague

statement that Defendant Pasque expected him, and all faculty, to be "collegial," which through the lens of social justice apparently means to voice no concerns about rigorous administration or hiring. Otherwise, the evaluation was positive.

47.     On September 3, 2018, Plaintiff once again exercised his free speech rights and published a post on his personal blog entitled "ASHE Has Become a Woke Joke." ASHE refers to the Association for the Study of Higher Education. Plaintiff's blog commented on some research a colleague of his had gathered about topics under discussion at the upcoming ASHE conference, which demonstrated that the focus of the conference had shifted from general post-secondary research to a focus on social justice.

48.     Plaintiff's criticism of ASHE generated controversy on social media. For example, a tweet posted on September 8, 2018 by Dr. Juhanna Rogers stated:

> conferences where race, racism, blackness, and women were left off the agenda still in abundance! As for me and the crew we vowed to create the spaces that look different ! @stephen porter maybe you need white spaces. As for ASHE we will be Woke!

49.     This is characteristic of Plaintiff's self-proclaimed "woke" critics. Any dissent from their orthodoxy is equated automatically with racism, misogyny, or worse.

50.     Another tweet thread, by Dr. OiYan Poon, said that Plaintiff's comments reflected "entitlement," "white supremacy," and "dog whistle racial politics." Apparently, Plaintiff's self-proclaimed "woke" critics also believe they possess supersonic hearing that enables them to hear inaudible racist comments

where there are none.

51.    The views of Plaintiff's critics are shared by a number of Defendants in this lawsuit. For example, the Twitter feed of Defendant Pasque contains numerous references to "intersectionality," "white supremacy," and the importance of qualitative rather than quantitative research – the very thing that Plaintiff was criticizing in his "Woke Joke" blog.

52.    Similarly, the Twitter feed of Defendant Gaston Gayles is filled with references to "systemic oppression," "white supremacy," "privilege," and the importance of emphasizing feelings over facts.

53.    As the 2018–2019 academic year opened, Defendant Danowitz met with the Higher Education Program Area faculty and told them they had the opportunity for a potential spousal hire. Universities in the region have an informal agreement to help place one member of an academic couple when they are interested in hiring the other member. The spouse of one of these hires was a well-known post-secondary researcher who was interested in a position with NCSU. Defendant Danowitz instructed the Higher Education Program Area faculty to meet and decide whether to bring this person in for an interview.

54.    Yet Defendant Gaston Gayles suppressed this topic on the Higher Education Program Area agenda, despite Plaintiff and another colleague requesting that the discussion be held as Defendant Danowitz directed.

55.    Instead, Defendant Pasque invited Plaintiff to a Google Hangout meeting on October 15, 2018, with herself, Defendant Gaston Gayles, and two other

individuals. Defendant Pasque characterized this meeting as a "new and exciting opportunity."

56.     The new opportunity Defendant Pasque proposed again involved Plaintiff leaving the Higher Education Program Area – this time, to create a new Higher Education Policy Program Area with Plaintiff, the potential spousal hire, and Defendant Pasque as the only members. This was now the second time in six months that Defendant Pasque proposed Plaintiff leave the Higher Education Program Area, this time citing a different reason.

57.     This was retaliation for Plaintiff's unpopular expression. After all, it was shortly after his April 2018 comments about the Inside Higher Ed article that Defendant Pasque first proposed he leave the Higher Education Program Area. Now, Defendant Pasque was proposing it again in the wake of his controversial blog calling ASHE a "woke joke."

58.     The tenor of the meeting quickly focused on Plaintiff's refusal to leave the Higher Education Program Area and the fact that this would supposedly prevent bringing in the potential spousal hire.

59.     Plaintiff was frustrated and mystified by this, as the Program Area faculty had never met to consider bringing in the spousal hire as directed by Defendant Danowitz, and as Plaintiff had spoken in favor of hiring the person from the beginning.

60.     In frustration at this apparent ambush, Plaintiff said "Give me a fucking break, folks. I was the one who said [the potential spousal hire] should

come. And now I'm the bad guy because I don't want to leave Higher Ed for a non-existent program area."

61.    On October 18, 2018, Plaintiff received a letter from Defendant Pasque chastising him for his use of profanity and his expressions of frustration at the meeting.

62.    On November 7, 2018, Plaintiff received another letter from Defendant Pasque, this time expressing concern about his "collegiality."

63.    In accusing Plaintiff of a lack of collegiality, Pasque emphasized three things, all of which relate directly to Plaintiff's protected speech:

      a.  The results of the 2017 climate study, in which Plaintiff was labeled a "bully" for questioning the utility of a proposed faculty evaluation question on diversity;

      b.  Plaintiff's April 2018 circulation of an article about the checkered past of a finalist for a faculty position in Plaintiff's department; and

      c.  Plaintiff's response to being asked to leave the Higher Education Program Area following his "woke joke" blog.

64.    Pasque's letter threatened that if Plaintiff "fail[s] to repair the relationships among faculty in the Higher Education program" or displays a "lack of collegiality" again, she would remove him from the Higher Education Program Area.

65.    Upon information and belief, Defendant Pasque was laying the pretextual groundwork for involuntarily removing Plaintiff from the Higher

Education Program Area, since he had strenuously objected to the idea the previous two times she had raised it.

66.    One week after receiving Defendant Pasque's letter, Plaintiff learned that the president of ASHE, Dr. Lori Patton Davis, had strongly criticized his "woke joke" blog in her keynote address to the ASHE conference, including putting up a slide with Plaintiff's name and photograph alongside a screenshot of his blog during her speech to several hundred people.

67.    The following Monday, November 19, 2018, Plaintiff received an email from Defendant Pasque informing him that ELPHD graduate students were having "strong reactions" to the keynote and that the department "need[ed] to pay attention to" them. She proposed a "community conversation about ASHE" at which Plaintiff would be expected to address graduate students' concerns about his blog.

68.    Plaintiff requested clarification about the so-called "community conversation," but noted that in the meantime, he would be happy to chat with any students or faculty who had concerns. *Id.*

69.    Defendant Pasque responded that the purpose of the meeting would be to help graduate students reconcile the "great teacher" they knew from NCSU with what they had heard about Plaintiff from the president of ASHE. *Id.*

70.    Plaintiff repeatedly inquired about how many students had raised concerns, and what the nature of their concerns were, but received no answer. Finally, Defendant Pasque admitted to Plaintiff that only two out of about 60 doctoral students spoke with her about the matter. Plaintiff only received one email

from one student about it.

71.     After some additional back-and-forth about how best to address graduate students' concerns, a group of ELPHD faculty who had attended an evening social with students met after the social to discuss Plaintiff's blog post. Plaintiff was excluded from the meeting.

72.     Plaintiff asked that time be set aside in the upcoming January 2019 Higher Education Program Area meeting to discuss whether a public meeting should be held about his blog. Defendant Gaston Gayles did not include the topic on the agenda, and it was never discussed – apparently, the Higher Education Program Area faculty preferred to discuss Plaintiff behind his back.

73.     On February 19, 2019, Plaintiff and Defendant Pasque met to discuss her November 7, 2018 letter.

74.     During that meeting, Defendant Pasque repeatedly expressed her frustration that Plaintiff had not proactively addressed student and faculty concerns about "what happened at ASHE" – namely, the fact that Plaintiff had posted a blog critical of ASHE with which the president of the organization had publicly disagreed, and which had apparently upset a few students.

75.     Pasque cited Plaintiff's lack of proactive action as a further example of his lack of collegiality.

76.     Between February 19, 2019 and July 5, 2019, Plaintiff heard nothing further from Defendant Pasque about these issues.

77.     Then, on Friday, July 5, 2019, in the middle of a holiday weekend,

Plaintiff received his annual evaluation letter from Defendant Pasque.

78.     After noting his accomplishments in the previous year, Defendant Pasque notified Plaintiff that she was unilaterally removing him from the Higher Education Program Area because "the Higher Education faculty were not able to make concerted progress" on resolving issues within the Program Area. This was direct retaliation for Plaintiff's expression of unpopular viewpoints. Pasque also stated that because of the reduced departmental workload, Plaintiff would be expected to teach an extra course. Defendant Pasque noted that Defendant Danowitz was involved in making this decision. *Id.*

79.     Pasque's decision resulted in Plaintiff's near-total exclusion from all Higher Education activities, including doctoral activities.

80.     Moreover, upon information and belief, no other tenured faculty in the College of Education has ever been mandated to teach a fifth course.

81.     In July 2019, Defendant Pasque left NCSU and was replaced as department head by Defendant Lee.

82.     On August 28, 2019, Plaintiff filed an internal grievance contesting his removal from the Higher Education Program Area and the addition of a fifth course to his teaching load.

83.     During the grievance process, Defendant Lee told Plaintiff he would not require him to teach the extra course, but the written requirement remains a part of Plaintiff's personnel file.

84.     Plaintiff's exclusion from the Higher Education Program Area had an

immediate and significant impact on his role in ELPHD. Despite Defendant Pasque's assurance that Plaintiff would remain involved in the Higher Education Ph.D. program, her actions effectively erased him from every aspect of the Higher Education doctoral program.

85.    Defendants Lee and Gaston Gayles barred Plaintiff from attending the Higher Education Orientation for new Ph.D. students, the Higher Education welcome cookout, and the Higher Education Retreat, during which the faculty discussed many issues related to the doctoral program.

86.    Defendants Lee and Gaston Gayles also excluded Plaintiff from the Diagnostic Advisement Procedure ("DAP") process for second-year Ph.D. students, severely undermining Plaintiff's role as an advisor to his students.

87.    At the time, Plaintiff was advising three Ph.D. students who were scheduled to go through the DAP process that year.

88.    The DAP is a high-stakes process; the faculty can decide to remove a student from doctoral study if they fail the DAP.

89.    NCSU's Higher Education Student Handbook provides that a student's advisor should be one of two readers reviewing writing samples submitted by student candidates for the DAP and that after those reviews, there should be a meeting of all Higher Education faculty members to discuss all students going through the DAP.

90.    On September 18, 2019 – just one week before the DAP meeting – Plaintiff reached out to Defendant Lee to express his concern that Defendant

Gaston Gayles was excluding him from the DAP process, both by excluding him from the upcoming DAP meeting and by not assigning him any DAP writing samples to review.

91.     Defendant Lee replied that "I'll work on this right now and get back ASAP." *Id.*

92.     Defendant Lee did not get back to Plaintiff, and the Higher Education faculty met and went through the DAP process, intentionally excluding Plaintiff.

93.     On September 26, 2019, Plaintiff emailed Defendant Lee to ask how he should communicate with his advisees about the DAP, given their expectation that he would have participated in the process. *Id.*

94.     In that email, Plaintiff also expressed his concern over how the department's systematic exclusion of him was affecting his relationship with his advisees:

> I am also unsure how to proceed in terms of my relationships with all of my advisees, not just those involved in yesterday's DAP. Although I officially remain their advisor, in practice my relationship seems to be slowly and involuntarily eroded to the point where, perhaps, I will not be able to function as such in good faith.

95.     On October 3, 2019, Defendant Lee sent an email to Plaintiff's advisees explaining that "the program faculty in the higher education PhD program area of study (PAS) met last week to complete part of the program work on the Diagnostic Advisement Procedure (DAP). Dr. Porter was not in attendance for the review as this portion of the DAP process was completed during another program meeting for which Dr. Porter is not participating." *Id.*

96.     This humiliated Plaintiff, who felt as though his advisees might think he simply did not care enough about their progress in the doctoral program to participate in their DAP process.

97.     On October 23, 2019, Plaintiff met with Defendant Lee to discuss his ongoing concerns about his exclusion from Higher Education Ph.D. activities.

98.     At this meeting, Defendant Lee stated that Plaintiff would be permitted to continue advising doctoral students, but that because of his involuntary exclusion from the Higher Education Program Area, he would likely not be able to participate in meetings concerning the DAP as well as students' dissertation prospectuses.

99.     In response, Plaintiff asked Defendant Lee why any doctoral students would choose Plaintiff as their advisor if Plaintiff could not participate in the DAP process or review their prospectus.

100.     Defendant Lee answered that "I guess that'd have to be something you talk to students about."

101.     Plaintiff expressed his concern to Defendant Lee that "the process is being set up so that when I go up for my post-tenure review a couple of years from now, I'm not going to have any advisees. And then you and Dean Danowitz can say well, we need to strip Porter of tenure and fire him because he's not fulfilling his job duties."

102.     Defendant Lee replied simply "Right, I hear you."

103.     Although Higher Education Program Area meetings – from which

Plaintiff had been removed – were supposed to be devoted to the Master's program, those meetings continually dealt with Ph.D. issues throughout the 2019–2020 academic year. This resulted in Plaintiff's near-total exclusion from Ph.D. activities.

104.    In December 2019, Plaintiff was prohibited from attending the Ph.D. admissions meeting. Because advisees are assigned during that meeting, in this way Defendants ensured that Plaintiff was not assigned any advisees. Plaintiff was also barred from attending a Recruitment Weekend for prospective Ph.D. students in the Spring.

105.    In June 2020, NCSU denied Plaintiff's grievance, finding that it was within Defendant Pasque's discretion to remove him from the Higher Education Program Area and that although he had been excluded from numerous doctoral activities, that had not been Defendant Lee's "intent."

106.    Plaintiff's exclusion from activities central to his job performance continued into the 2020–2021 academic year. In September 2020, Plaintiff emailed Defendant Lee to clarify whether he was still prohibited from attending Higher Education Program Area meetings, which Defendant Lee confirmed.

107.    In October 2020, some ELPHD faculty – led by Defendant Gaston Gayles and Alyssa Rockenbach – proposed a new Ph.D. Program Area of Study in Higher Education Access, Equity, and Justice, the focus of which would be to "undo and dismantle oppressive institutions, systems, and educational structures" and replace them with "learning environments and opportunities that uplift, humanize, and foster freedom and joy for all people, but especially for people who find

themselves on the margins of society today."

108.    The proposal for the new PAS was initially shared with faculty "who expressed an interest in participating." *Id.* Plaintiff was never asked whether he would be interested in participating.

109.    In January 2021, the full ELPHD faculty, including Plaintiff, was presented with a proposal for the new PAS.

110.    All faculty members from the existing Higher Education PAS except for Plaintiff were invited to join the new PAS, which was ultimately named Higher Education Opportunity, Equity, and Justice. Plaintiff's colleague Paul Umbach declined to join the new PAS and remained with Plaintiff in the old Higher Education PAS.

111.    In February 2021, Umbach emailed Defendant Lee that

> The lack of transparency, the rush to launch, the inability to get clear answers, the overtaking of recruitment weekend, and the lack of time to plan for the program's future all point to the fact that you and others are aiming to shut down the program. You've bent over backwards to support the new PAS but have done almost nothing to address our continued concerns and directly answer our questions. Given all of this, it seems reasonable to conclude that the aim is to shut down the higher education program and have this new PAS emerge as the new and only higher ed program.

112.    Plaintiff and Umbach further emailed Defendant Lee to express their frustration at having been left out of important Ph.D. recruitment activities. In defiance of all of the facts, Defendant Lee continued to insist that recruitment weekend was only a Master's activity and that no formal offers of admission were being made to the new PAS. *Id.*

113.    This was another blatant effort to effectively force Plaintiff out by siloing him in a now dead-end program area. Had Umbach not declined the invitation to join the new PAS, Plaintiff would have been the only full-time ELPHD faculty member remaining in the old Higher Education PAS.

114.    In March 2021, Defendant Lee informed Plaintiff and Umbach that they could make offers of admission to doctoral candidates they wanted to advise, but that after the offer of admission, those candidates would be encouraged to switch away from Plaintiff and Umbach and into the new PAS *Id.*

115.    With the creation of the new PAS, Plaintiff has effectively been siloed in a PAS that is drained of students and resources. This has severely compromised his ability to perform critical job duties – such as advising Ph.D. students – and has left his future at NCSU in serious jeopardy.

### **FIRST CAUSE OF ACTION**
**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Retaliation**

116.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

117.    Plaintiff engaged in constitutionally protected speech and has been subjected to numerous adverse employment actions as a result. These actions have severely limited Plaintiff's ability to perform core requirements of his job, setting the stage for his eventual termination.

118.    Plaintiff's speech involved a matter of public concern: whether the field

of higher education should sacrifice academic rigor in favor of furthering a particular view of "social justice."

119. Defendant Pasque explicitly cited "communication" within the department in explaining her decision to remove him from the Higher Education Program Area, a decision in which Defendant Danowitz took part.

120. Defendant Lee not only continued to enforce Defendant Pasque's unconstitutional decision, but, along with Defendant Gaston Gayles, took affirmative steps to further exclude Plaintiff from additional Ph.D. program activities beyond those of the Higher Education Program Area, further restricting his ability to fulfill essential job requirements.

121. Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

122. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
**Declaratory Judgment and Injunction (28 U.S.C. § 2201, et seq.)**

123. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

124. An actual controversy has arisen and now exists between Plaintiff and

Defendants concerning Plaintiff's rights under the United States Constitution. A judicial declaration is necessary and appropriate at this time as to Count I, above.

125.    Plaintiff desires a judicial determination of his rights against Defendants as they pertain to Plaintiff's rights to speak about matters of public concern without being subjected to adverse employment actions.

126.    To prevent further violation of Plaintiff's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 22 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring Defendants' actions unconstitutional.

127.    Pursuant to 22 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction ordering the Defendants to reinstate Plaintiff to the Higher Education Program Area and allow him to join the Higher Education Opportunity, Equity, and Justice PAS, including all of the meetings and activities that follow from such actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Stephen R. Porter respectfully requests that the Court enter judgment against Defendants and provide Plaintiff with the following relief:

1.    A declaration stating that Defendants' actions violated Plaintiff's right to free speech on matters of public concern;

2.    A permanent injunction requiring Defendants to reinstate Plaintiff to the Higher Education Program Area and to allow him to join the Higher Education

Opportunity, Equity, and Justice PAS, and removing the requirement of a fifth course from his personnel file;

3.    Monetary damages in an amount to be determined by the Court to compensate Plaintiff for the deprivation of fundamental rights;

4.    Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k); and

5.    Such further and additional relief as the Court shall deem just, proper and authorized by law, and that the costs of this action be taxed against Defendants.

**JURY DEMAND: PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

This 14th day of September 2021.

/s/ Samantha K. Harris
Samantha K. Harris
ALLEN HARRIS LAW
PO Box 673
Narberth, PA 19072
(860) 481-7899
sharris@allenharrislaw.com
PA Bar No. 90268
Attorney for Plaintiff


/s/ Jonathan A. Vogel
Jonathan A. Vogel
VOGEL LAW FIRM PLLC
6000 Fairview Road
South Park Towers, Suite 1200
Charlotte, NC 28210
(704) 552-3750
Fax: (704) 552-3705
jonathan.vogel@vogelpllc.com
NC Bar No. 34266
Local Civil Rule 83.1(d) Counsel for Plaintiff