# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### CIVIL ACTION NO: 5:21-cv-00365-BO

STEPHEN R. PORTER, PH.D.,

      **Plaintiff,**

v.

BOARD OF TRUSTEES OF NORTH
CAROLINA STATE UNIVERSITY, W.
RANDOLPH WOODSON, MARY ANN
DANOWITZ, JOY GASTON GAYLES,
JOHN K. LEE, AND PENNY A.
PASQUE, individually and in their
      official capacities,

      **Defendants.**

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## NATURE OF THE CASE[1]

Stephen Porter ("Plaintiff"), a tenured professor in the College of Education at North Carolina State University ("NC State"), commenced this action on September 14, 2021, against the Board of Trustees of NC State ("BOT"), W. Randolph Woodson (Chancellor), Mary Ann Danowitz (former Dean of the College of Education), John K. Lee (Head of the Department of Educational Leadership, Policy, and Human Development ("ELPHD"));[2] Penny A. Pasque (former Head of the ELPHD Department), and Joy Gaston Gayles (Professor in ELPHD and Program Coordinator). (D.E. 1 ¶¶7-12). Plaintiff asserts a freedom of speech retaliation claim against Defendants under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. §1983 ("Section 1983").

Plaintiff contends that Defendants took adverse employment actions against him in July of 2019 due to his outspokenness regarding the focus in education on social justice. (D.E. 1 ¶19). Plaintiff asserts, specifically, that three statements or communications that he made in 2016-18 resulted in his removal, in July of 2019, from the Higher Education Program Area (one of several degree program areas in ELPHD) and his exclusion from various departmental events involving Ph.D. students. (D.E. 1 ¶¶20, 37, 47, 57, 78, 118-120). Plaintiff asserts that he was also told that he was going to have to teach an additional (fifth) course. (D.E. 1 ¶78).

Defendants request that all claims be dismissed pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6). Plaintiff's claims are barred by sovereign immunity, Eleventh Amendment immunity, and qualified immunity. Moreover, taking Plaintiff's allegations as true, the Complaint fails to

---

[1] While Plaintiff's allegations are assumed true for Defendants' Motion to Dismiss, Defendants reserve the right to contest Plaintiff's factual allegations at the appropriate time.

[2] Defendant Lee is Interim Head of the ELPHD and Associate Dean for Faculty and Academic Affairs. See https://ced.ncsu.edu/people/jklee/.

1

state a valid free speech retaliation claim against Defendants. Plaintiff's Complaint reveals that it was Plaintiff's behavior toward his colleagues and his failure to respond to student complaints-- not any alleged expression of protected speech--which served as a basis for the actions about which he complains. Plaintiff's Complaint further indicates that Plaintiff has not been demoted, disciplined, or subjected to any decrease in salary or employment benefits, and has not realized any other negative impact—financial or otherwise—due to any alleged conduct by Defendants.

## STATEMENT OF FACTS

Plaintiff has been a tenured professor in NC State's College of Education, Department of ELPHD, since 2011. (D.E. 1 ¶6). The ELPHD department has several degree program areas including the "Higher Education Program Area." (D.E. 1 ¶15). ELPHD offers two degrees in the Higher Education Program Area: a Master's degree and a Ph.D. degree (no undergraduate degrees). (D.E. 1 ¶15). Plaintiff teaches statistics and research method courses and has limited involvement in the Master's program. (D.E. 1 ¶¶13, 15). Plaintiff asserts, in fact, that "[h]e has no Master's advisees and does not attend events related only to the Master's degree." (D.E. 1 ¶15). While Plaintiff states that he is prominent in the field of post-secondary research, he does not assert that he actually teaches, or has ever taught, classes in Higher Education. (D.E. 1 ¶13).

Plaintiff asserts that he joined the Higher Education Program Area when he began his employment at NC State and that he remains a member of the Higher Education Program Area. (D.E. 1 ¶¶13, 15). In 2015, the College of Education created a college-wide Ph.D. program called the Scholar Leader Ph.D. (D.E. 1 ¶¶16-17). At this time, two separate tracks were created, with the Master's degree programs being located within the Higher Education Program Areas and the Ph.D. programs being housed in a separate Ph.D. "Program Area of Study." (D.E. 1 ¶17). Per

2

Plaintiff, ELPHD continued to address both Master's and Ph.D. matters within the original Program Areas. (D.E. 1 ¶¶17-18).

In support of his free speech retaliation claim, Plaintiff asserts that he has been "outspoken about his concerns with how the focus on so-called 'social justice' is affecting academia" and how academia is "abandoning rigorous methodological analysis in favor of results-driven work aimed at furthering a highly dogmatic view of 'diversity,' equity,' and 'inclusion.'" (D.E. 1 ¶19). Plaintiff references three statements or communications which he contends subjected him to alleged unconstitutional retaliation:

<u>Communication #1</u>: In Spring 2016, Plaintiff expressed concerns during a departmental meeting about a proposal by the College of Education's Council on Multicultural and Diversity Issues to add a question about diversity to student course evaluations. (D.E. 1 ¶¶20, 22-23). The proposal was presented by Teaching Associate Professor Valerie Faulkner. (D.E. 1 ¶¶20, 22-23). Plaintiff claims that the discussion was "amicable," but acknowledges that it was "perhaps embarrassing for Faulkner, as it became apparent that the [College of Education's] Council had created the new question about diversity without consideration or testing for validity and reliability." (D.E. 1 ¶23). In May 2017, a "Climate Check Report" ("Climate Study") was conducted by NC State's Office for Institutional Equity and Diversity ("OIED") in which Plaintiff was described and labeled by other faculty as a "bully." (D.E 1 ¶¶24, 26-27). Plaintiff acknowledges that his conduct during the Spring 2016 departmental meeting was referenced as an example of his bullying. (D.E. 1 ¶¶24, 26-27).

Defendant Pasque became the Head of ELPHD at the start of the 2017-18 academic year. In a meeting with Plaintiff on November 2, 2017, Defendant Pasque informed Plaintiff of the Climate Study conducted prior to the time she became Head of the ELPHD. (D.E. 1 ¶¶25-28).

3

She informed Plaintiff that he had been described as a "bully," and noted the 2016 departmental meeting as an example. (D.E. 1 ¶¶26-28). She indicated there were other examples but did not describe them. (D.E. 1 ¶¶26-28). Plaintiff asserts that Defendant Pasque restated her concerns about "bullying" in a January 22, 2018 e-mail which was put in his personnel file. (D.E. 1 ¶¶29-32).

Communication #2: In April 2018, NC State, via a search committee chaired by Plaintiff's colleague Alyssa Rockenbach (a Professor in the College of Education), was considering hiring a candidate (Terrell Strayhorn) from another university. (D.E. 1 ¶¶33-36). Plaintiff asserts that he was concerned that Professor Rockenbach "cut corners on her vetting of Strayhorn, who is Black, out of a desire to hire a Black scholar whose work focused on racial issues." (D.E. 1 ¶36). When an article critical of the candidate was published in *Inside Higher Ed* on April 11, 2018, Plaintiff sent a link to the article to faculty in the Higher Education Program Area. (D.E. 1 ¶¶33, 37). Plaintiff admits that he stated as follows in his e-mail: "This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work, Alyssa." (D.E. 1 ¶37).

On April 19, 2018, Defendant Pasque met with Plaintiff about the April 11, 2018 e-mail and asked him what his intent was in sending it. (D.E. 1 ¶¶37-38). Plaintiff acknowledges that faculty commented to Defendant Pasque about the e-mail and/or forwarded it to other faculty. (D.E. 1 ¶40). Plaintiff asserts, for instance, that Defendant Gayles, a fellow-professor and the Program Coordinator of the Higher Education Program Area, sent the following e-mail to Defendant Pasque: "NOT COOL!!!! I am so mad about all of this I could scream!! I can't stay silent about this. It's maddening!" (D.E. 1 ¶40).

Plaintiff contends that during a follow-up meeting with Defendant Pasque on April 24, 2018, Defendant Pasque told him that she had "inquired whether Plaintiff had to remain a member

of the Higher Education Program Area or whether he could remain a member of the department without a Program Area." (D.E. 1 ¶41). At the same time, Plaintiff acknowledges that his annual evaluation that year was positive, but concedes that he was informed by Defendant Pasque in the evaluation that she expected all faculty to be "collegial." (D.E. 1 ¶46).

Communication #3: On September 3, 2018, Plaintiff published a post on his personal blog entitled, "ASHE[3] Has Become a Woke Joke." (D.E. 1 ¶47). Per Plaintiff, the blog "commented on some research a colleague of his had gathered about topics under discussion at the upcoming ASHE conference, which demonstrated that the focus of the conference had shifted from general post-secondary research to a focus on social justice." (D.E. 1 ¶47). The post read as follows:

> A colleague sent this to me. They searched the latest Association for the Study of Higher Education (ASHE) conference program for the following [25] terms, to see how many sessions came up . . . . I prefer conferences where 1) the attendees and presenters are smarter than me and 2) I constantly learn new things. That's why I stopped attending ASHE several years ago and switched to AEFP.

See Motion to Dismiss at Ex. A.[4] Plaintiff maintains that his criticism of ASHE generated controversy on social media. (D.E. 1 ¶¶48-52).

At or around this time, at the beginning of the 2018-19 academic year, Defendant Danowitz, Dean of the College of Education, informed the Higher Education Program Area faculty that there was an opportunity for a potential spousal hire. (D.E. 1 ¶53). She asked faculty to meet

---

[3] ASHE stands for the "Association for the Study of Higher Education." ASHE is a national group, not an NC State entity. (D.E. 1 ¶47).

[4] See Phillips v. LCI Int'l Inc., 190 F.3d 609, 618 (4th Cir. 1999) (stating that "a court may consider [a document outside the complaint] in determining whether to dismiss the complaint" where the document "was integral to and explicitly relied on in the complaint."), see also Am. Chiropractic v. Trigon Healthcare, 367 F.3d 212, 234 (4th Cir. 2004) (permitting the consideration of a written agreement attached to the 12(b)(6) motion to dismiss because the agreement was referenced in the complaint). Here, Plaintiff expressly refers to and relies on the September 3, 2018, blog post. (D.E. 1 ¶47).

and decide whether to interview the spouse. (D.E. 1 ¶53). The topic was discussed during a Google Hangout meeting on October 15, 2018, where Defendant Pasque, with others present, discussed the possible creation of a new "policy" program area (separate from the Higher Education Program Area) that would include Plaintiff, the potential spousal hire, and Defendant Pasque. (D.E. 1 ¶¶54-56). Plaintiff acknowledges in the Complaint that he was frustrated, and admits that he responded to the idea as follows: "**Give me a fucking break, folks**. I was the one who said [the potential spousal hire] should come. And now, I'm the bad guy because I don't want to leave Higher Ed for a non-existent program area." (D.E. 1 ¶60) (emphasis added).

On October 18, 2018, Plaintiff received a letter from Defendant Pasque "chastising him" for his use of profanity during the faculty meeting. (D.E. 1 ¶¶ 12, 55, 61). On November 7, 2018, Defendant Pasque sent another letter to Plaintiff wherein she, again, expressed concerns regarding his behavior. (D.E. 1 ¶62). In this letter, Defendant Pasque referenced the results of the 2017 Climate Study, Plaintiff's April 11, 2018 departmental email regarding the candidate for hire, and Plaintiff's profanity during the October 15, 2018 meeting. (D.E. 1 ¶¶63-64). Plaintiff was informed that if he failed to repair his relationships with faculty in the Higher Education Program Area, or if he displayed a "lack of collegiality" again, he would be removed from the Higher Education Program Area. (D.E. 1 ¶64).

Subsequently, Plaintiff learned that the president of ASHE, Dr. Lori Patton Davis, had strongly criticized his September 2018 "woke joke" blog in her keynote address at the ASHE conference.[5] (D.E. 1 ¶66). During the ASHE conference, which occurred in November 2018 (two months after Plaintiff posted the blog), the keynote speaker showed a slide of the blog and a photograph of Plaintiff during her address. (D.E. 1 ¶66). Following the conference, on November

---

[5] Plaintiff does not assert that Dr. Davis is a current or former employee of NC State.

19, 2018, Defendant Pasque notified Plaintiff via email that ELPHD graduate students were having a "strong reaction" to the keynote address which the ELPHD Department needed to address. (D.E. 1 ¶67). Defendant Pasque recommended a community meeting where Plaintiff could address the graduate students' concerns. (D.E. 1 ¶67). Defendant Pasque told Plaintiff that a community conversation would help students reconcile the "great teacher" they knew at NC State with what they heard from the president of ASHE. (D.E. 1 ¶69). Plaintiff admits that he did not agree to have a school community meeting to address and resolve any student concerns, and instead questioned whether such a meeting was necessary. (D.E. 1 ¶¶68, 70). On February 19, 2019, Plaintiff met again with Defendant Pasque. (D.E. 1 ¶73). During this meeting, Defendant Pasque expressed her frustration with Plaintiff's failure to address proactively student and faculty concerns about "what happened at ASHE." (D.E. 1 ¶¶73-74).

On July 5, 2019, Plaintiff received his annual review from Pasque. (D.E. 1 ¶77). The review noted his accomplishments for the year, but informed him that he was being removed from the Higher Education Program Area because "the Higher Education faculty were not able to make concerted progress" on resolving issues within the Program Area. (D.E. 1 ¶¶77-78). Plaintiff acknowledges that Defendant Pasque assured him that he would remain in the Higher Education Ph.D. program. (D.E. 1 ¶84). The review also informed Plaintiff that he would be expected to teach an additional course due to his reduced departmental workload. (D.E. 1 ¶78).

In July 2019, Defendant Pasque left NC State, and Defendant Lee became the Head of ELPHD. (D.E. 1 ¶¶11, 81). On August 28, 2019, Plaintiff filed an internal grievance contesting his removal from the Higher Education Program Area and his increased teaching load. (D.E. 1 ¶82). Plaintiff acknowledges that he was informed by Defendant Lee during the grievance process that he was not going to be required to teach an extra course. (D.E. 1 ¶83).

Plaintiff asserts that his removal from the Higher Education Program Area resulted in his exclusion from certain activities pertaining to Ph.D. students, including the Higher Education Orientation, the Higher Education welcome cookout, and the Higher Education Retreat. (D.E. 1 ¶¶79, 85, 104). Plaintiff contends that Defendant Lee and Defendant Gayles also barred him from the Diagnostic Advisement Procedure ("DAP") process for second-year Ph.D. students which, according to Plaintiff, undermined his role as an advisor to his students. (D.E. 1 ¶¶86-87). Plaintiff states that he discussed his concerns with Defendant Lee, informing him that "the process is being set up so that when I go up for my post-tenure review a couple of years from now, I'm not going to have any advisees. And then you and Dean Danowitz can say well, we need to strip Porter of tenure and fire him because he's not fulfilling his job duties." (D.E. 1 ¶¶98-100, 101).

Plaintiff states that his internal grievance "was denied" in June 2020, "finding that it was within Defendant Pasque's discretion to remove Plaintiff from the Higher Education Program Area." (D.E. 1 ¶105). The grievance panel also found that "although he had been excluded from numerous doctoral activities, that had not been Defendant Lee's intent." (D.E. 1 ¶105). As stated above, Plaintiff acknowledges that the Higher Education Program Area meetings, from which he was excluded, were supposed to be devoted to the Master's degree program only. (D.E. 1 ¶103). Plaintiff concedes he has no Master's advisees, nor does he attend events related only to the Master's degree. (D.E. 1 ¶15).

In October 2020, ELPHD faculty Defendant Gayles and Professor Rockenbach proposed a new Ph.D. Program Area of Study referred to as "Higher Education Access, Equity, and Justice." (D.E. 1 ¶107). Plaintiff alleges that he was not asked to join this new Ph.D. Program Area of Study and asserts that the creation of the new Ph.D. Program Area of Study will impact his ability to perform his duties, such as obtaining and advising Ph.D. students. (D.E. 1 ¶¶110, 112, 115).

While Plaintiff alleges that his removal from the Higher Education Program Area could impact his future at NC State, Plaintiff does not indicate that he has lost any advisees, has not been able to recruit and obtain new advisees, or that his future as a Professor has been questioned or is in actual jeopardy. (D.E. 1). Plaintiff does not aver that he has been disciplined, demoted, been subject to any decrease to salary or benefits, or suffered any other tangible negative impact in his position. (D.E. 1). Plaintiff admits that he has not had to teach an additional course. (D.E. 1 ¶82). Indeed, Plaintiff remains employed as a tenured Professor with NC State in ELPHD. (D.E. 1 ¶6). It is also significant that Plaintiff does not state that he was ever asked to retract his statements, cease posting on his personal blog, or stop expressing his opinions. (D.E. 1). Plaintiff was simply asked, like other faculty, to remain collegial to other faculty and to have an open dialogue with graduate students to address concerns related to the ASHE conference. (D.E. 1 ¶¶46, 67).

## ARGUMENT

### PLAINTIFF'S CLAIMS ARE BARRED BY SOVEREIGN, ELEVENTH AMENDMENT, AND QUALIFIED IMMUNITIES, AND HIS COMPLAINT FAILS TO MEET THE PLEADING REQUIREMENTS FOR A FREE SPEECH RETALIATION CLAIM.

When subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction to survive dismissal. Evans v. B. F. Perkins Co., 166 F.3d 642, 647-50 (4th Cir. 1999). The same is true for jurisdictional challenges pursuant to Rule 12(b)(2). "[T]he jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citations omitted).

To survive a Rule 12(b)(6) motion, a Complaint must rise above the "speculative level" and satisfy the court that the claims asserted are plausible on their face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). A claim is plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted). The complaint must "permit the court to infer more than the mere possibility of misconduct." Iqbal, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citations omitted). A court need not accept as true "unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp., 213 F.3d 175, 180 (4th Cir. 2000).

I.    **Plaintiff's Complaint does not contain any allegations of wrongdoing against Defendants BOT or Woodson and all claims against them should be dismissed.**

While Plaintiff names the BOT and Chancellor Woodson as Defendants in the caption, a review of the Complaint fails to identify any claims against these Defendants, nor does it attribute any alleged wrongful conduct to them. Other than being identified in the caption and listed under "Parties," these Defendants are not mentioned further in the Complaint.

Plaintiff's failure to reference these Defendants except by means of identifying them requires the dismissal of Plaintiff's claims against them. The mere possibility of misconduct is insufficient to survive a motion to dismiss. Iqbal, 556 U.S. at 679. Plaintiff's general references to "Defendants" as a group also fails to save Plaintiff's purported claims against Defendants BOT or Woodson. See Fox v. City of Greensboro, 807 F. Supp. 2d 476, 495 (M.D.N.C. 2011) (dismissing claims based upon the plaintiff's failure to provide an indication "of what actions each Defendant allegedly took"); Boykin Anchor Co. v. AT&T Corp., No. 5:10-CV-591-FL, 2011 U.S. Dist. LEXIS 40783, at *14 (E.D.N.C. Apr. 14, 2011) ("[P]laintiff cannot rely on bare allegations relating . . . to all defendants . . . but must identify specific acts or conduct taken by each defendant to state a claim.") (quotation omitted). As a result, this Court should dismiss all claims against Defendants BOT and Woodson.

## II.  **Plaintiff's Section 1983 claims against the BOT and the individual Defendants in their official capacities are barred by sovereign and Eleventh Amendment immunities.**

Plaintiff's claims for monetary damages pursuant to 42 U.S.C. § 1983 against the BOT and individual Defendants Woodson, Danowitz, Gayles, Lee, and Pasque in their official capacities are barred by sovereign immunity and Eleventh Amendment immunity.  The Eleventh Amendment prohibits actions in federal court by individuals against a state unless the state has consented to suit, or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity. Ballenger v. Owens, 352 F.3d 842, 844-45 (4th Cir. 2003). The doctrine of sovereign immunity under the Eleventh Amendment applies not only to actions in which the State is a named defendant, but also to actions against its departments, institutions, and agencies.  The Eleventh Amendment immunity protection extends to the BOT as an alter ego of the State.  Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1138 (4th Cir. 1990) ("the Eleventh Amendment bars suit by private parties to recover money damages from the state or its alter egos acting in their official capacities"), Al-Deen v. Trs. of Univ. of N.C., Wilmington, 102 F. Supp. 3d 758, 764 (E.D.N.C. 2015) (dismissing Section 1983 claims against the board of trustees and other defendants named in their official capacities).  Additionally, in North Carolina, "[a]ctions against officers of the State in their official capacities are actions against the State for the purposes of applying the doctrine of [sovereign] immunity."  Green v. Kearney, 203 N.C. App. 260, 268, 690 S.E.2d 755, 762 (2010) (citation omitted), Mullis v. Sechrest, 347 N.C. 548, 554, 495 S.E.2d 721, 725 (1998) ("[O]fficial-capacity suits are merely another way of pleading an action against the governmental entity.").

It is well established that Congress did not intend federal civil rights laws such as 42 U.S.C. § 1983 to abrogate the states' immunity. Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989) (Eleventh Amendment precludes claims against a State and its instrumentalities brought

pursuant to 42 U.S.C. § 1983); Huang, 902 F.2d 1134 at 1139; Al-Deen, 102 F. Supp. 3d at 764

(dismissing Section 1983 monetary and declaratory injunctive claims against Trustees and state

officials of UNCW); Emanuelson v. Univ. of N.C. at Greensboro, No. 1:17CV534, 2018 U.S. Dist.

LEXIS 63033, *13 (M.D.N.C. Apr. 12, 2018) (holding a Section 1983 claim against a state

university is barred by Eleventh Amendment). Accordingly, the BOT and individual Defendants

in their official capacities have not consented, legislatively or otherwise, to being sued for the

Section 1983 claims herein. Likewise, Defendants have not waived--nor has Plaintiff alleged that

they have waived--immunity pursuant to the Eleventh Amendment. Plaintiff's federal statutory

claim for monetary damages against the BOT and NC State officials pursuant to Section 1983 is

therefore barred and should be dismissed pursuant to Fed. R. Civ. P. R. 12(b)(1), (2), and (6).[6]

### III.     Plaintiff's Complaint fails to state a freedom of speech retaliation claim and, therefore, all remaining claims should be dismissed.

Plaintiff has failed to state a claim under 42 U.S.C.S. § 1983 for violation of his First

Amendment rights. As held by the Fourth Circuit,

> When a government employee claims that he was disciplined because of his speech, we use a three-prong test to determine if the employee's rights under the First Amendment were violated. McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998). The first prong asks whether the employee "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." Id. This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, [Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)], and whether the content of the speech addressed "a matter of interest to the community" rather than "complaints over internal office affairs." [Connick v. Myers, 461 U.S. 138, 149 (1983)]. If the speech was made as a citizen and

---

[6] As set forth in Vaughn v. Transdev Servs., 179 F. Supp. 3d 559, 569 n.2 (E.D.N.C. 2016),

> "[T]he federal courts have tended to minimize the importance of the designation of a sovereign immunity defense as either a Rule 12(b)(1) motion regarding subject matter jurisdiction or a Rule 12(b)(2) motion regarding jurisdiction over the person." Id. at 327-28. Indeed, Iqbal and Davis suggest that the defense may be addressed as a matter of sufficiency of the pleading, pursuant to Rule 12(b)(6). See Iqbal, 556 U.S. at 674; Davis, 770 F.3d at 282. Accordingly, the court simply considers the dismissal here as one grounded in sovereign immunity.

addressed a matter of public concern, the second prong of the test requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services. [Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)]. The Pickering balancing test demands a "particularized" inquiry into the facts of a specific case. Connick, 461 U.S. at 150. If a court determines that the employee's interest outweighed the government employer's interest, the third prong requires a determination that the employee's speech caused the disciplinary action. McVey, 157 F.3d at 277-78. The first two prongs of this test are questions of law, while the third is a factual inquiry. Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012).

Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017). This test (known as the Pickering balancing test[7]) presumes as a starting point that there was indeed an adverse employment action taken against the public employee. Plaintiff, however, has failed to allege a sufficient adverse employment action, and, therefore, his claims should be dismissed. See Am. Civil Liberties Union, Inc. v. Wicomico Cty., 999 F.2d 780, 785 (4th Cir. 1993) ("A plaintiff alleging that government officials retaliated against her in violation of her constitutional rights must demonstrate, *inter alia*, that she suffered some adversity in response to her exercise of protected rights.").

While this failure alone is fatal to his claims, Plaintiff also fails to allege sufficiently the other required elements for a free speech retaliation claim. Plaintiff's Complaint fails to assert that Plaintiff engaged in speech involving a matter of public concern which outweighed Defendants' interest in the provision of efficient educational services. Id. Plaintiff's Complaint also negates his claim that the alleged adverse employment action taken against him was causally related to his expression of protected speech. Id.

A. **Plaintiff's Complaint does not identify an actionable adverse employment action.**

---

[7] The test was derived from the decision in Pickering, 391 U.S. at 573.

"Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." Am. Civil Liberties Union., 999 F.2d at 785. Employment actions that do not cause a "decrease in compensation, job title, level of responsibility, or opportunity for promotion" do not constitute adverse employment actions and are not sufficient to meet the pleading requirements for constitutional claims. Boone v. Goldin, 178 F.3d 253, 256-57 (4th Cir. 1999); see also Feminist Majority Found. v. Hurley, 911 F.3d 674, 697 n.12 (4th Cir. 2018) (noting that the materially adverse action standard is similar in Title VII and First Amendment retaliation cases); Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) ("An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" ); Dorsett v. Bd. of Trustees for State Colleges & Universities, 940 F.2d 121, 123 (5th Cir. 1991), citing Connick, 461 U.S. at 138-39 ("[D]ecisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures" do not rise to the level of a constitutional deprivation.).

Here, Plaintiff's Complaint fails to state an actionable adverse action. Plaintiff has not been disciplined, demoted, or terminated and has not suffered a decrease in salary or any other benefits.[8] Plaintiff complains, instead, that he was removed from the Higher Education Program Area, (D.E. 1 ¶¶77-79, 119-120), that he was also told he was going to have to teach a fifth class

---

[8] While Plaintiff makes the conclusory allegation that he "has suffered, and continues to suffer, economic injury," such allegation does not satisfy the plausibility standard. See Gilliam v. Bertie Cty. Bd. of Educ., No. 2:20-cv-00076-M, 2021 U.S. Dist. LEXIS 188001, at *13 (E.D.N.C. Sep. 30, 2021) ("Twombly's plausibility standard requires that a plaintiff's well-pleaded factual allegations be enough to raise a right to relief above the speculative level, i.e., allege enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]. A speculative claim resting upon conclusory allegations without sufficient factual enhancement cannot survive a Rule 12(b)(6) challenge.") (internal citations and quotations omitted).

(but never actually had to teach a fifth class), (D.E. 1 ¶¶78, 80), and that he has not been invited to join a recently-formed Ph.D. Program Area of Study, (D.E. 1 ¶108). These alleged actions, even if they occurred as Plaintiff asserts, are not sufficient to establish a claim for retaliation.

Rather, Plaintiff acknowledges in the Complaint that there are two tracks -- one for Master's degrees and certifications within the Program Area and one for Ph.D. programs in the Program Area of Study. (D.E. 1 ¶¶17, 103). Plaintiff admits that "throughout his tenure at NCSU," and prior to the alleged adverse action in July 2019, he had limited involvement in the Master's program, has no Master's advisees, and never attended events related only to the Master's students. (D.E. 1 ¶¶13, 15). Plaintiff alleges that he was removed from the Higher Education Program Area in which the Master's program with which he has "little involvement" was housed. However, Plaintiff does not deny that he continues to be a member of the Higher Education *Ph.D.* Program Area of Study. (D.E. 1 ¶¶15, 110). Plaintiff likewise does not dispute that he still is, and always has been, a tenured Professor in the College of Education. (D.E. 1 ¶¶13, 15). He also admits that he has not had to teach a fifth class and, in fact, has been informed that he will not have to teach a fifth course. (D.E. 1 ¶83).

Plaintiff contends that his removal from the Higher Education Program Area as it pertains to the Master's program resulted in his exclusion from several activities involving Ph.D. students. Even if this contention was plausible, this is not sufficient to state an adverse employment action. Plaintiff's Complaint fails to show that his employment has been significantly impacted, or that his role at NC State has materially changed because, allegedly, he was not able to participate in these events. Plaintiff does not assert that he regularly participated in these activities in the past and, again, Plaintiff does not -- and cannot -- allege any facts to show that Plaintiff's title, tenure status, salary, or benefits have been adversely affected.

Allegations of this nature have repeatedly been deemed insufficient as a matter of law to state or forecast actionable adverse actions. See e.g., Thorn v. Sebelius, 766 F. Supp. 2d 585, 603 (D. Md. 2011) (holding alleged retaliatory emails, reprimands, exclusion from work projects, and change in work duties are not adverse actions absent a decrease in salary or work schedule), Dorsett, 940 F.2d at 123 (finding no adverse action where professor had not been fired or threatened with termination, noting federal court is not the appropriate forum to address trivial matters involving public schools and universities such as teaching assignments, administrative duties, and departmental procedures), Harrington v. Harris, 118 F.3d 359, 366 (5th Cir. 1997) (holding that an employer's criticism of employees and failure to award them merit pay increases did not constitute actionable adverse employment actions). In Boone, the Fourth Circuit ruled in favor of an employer as a matter of law, finding that the plaintiff's reassignment to a different position, even with alleged poorer working conditions, was not sufficient to show an adverse employment action absent evidence that the reassignment caused significantly more stress than prior assignments. 178 F.3d at 256-57.

While Plaintiff asserts that his alleged exclusion from the various events referenced in the Complaint or the lack of invitation to join the new Program Area of Study could result in his inability to obtain or advise Ph.D. advisees in the future, Plaintiff does not assert sufficiently that this has actually occurred or will occur. Rather, Plaintiff's allegations that Defendants' actions have "set[] the stage for his eventual termination," or "left his future at NCSU in serious jeopardy," see D.E.1 ¶¶ 115, 117, are speculative at best and insufficient to satisfy pleading requirements. "Factual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555,

16

570. Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. ACLU, 999 F.2d at 785.

In James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371 (4th Cir. 2004), the Fourth Circuit held that allegations that the plaintiff's reassignment from project manager to senior associate was less appealing were not sufficient to establish an adverse action and that vague assertions that not being allowed to attend various meetings would be to the plaintiff's detriment were speculative and failed to show that that he was, in fact, adversely impacted by his reassignment. Id., cert. denied, 543 U.S. 959 (2004). "[S]peculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute [because] we are left to guesswork and conjecture as to what [plaintiff's]-prospects would have been." Id. (internal citations and quotations omitted). Similarly, herein, Plaintiff speculates about possible future adverse consequences but does not (and cannot allege) an actual adverse employment action.

As it stands, Plaintiff's allegations are a far cry from allegations deemed sufficient "adverse employment actions" in other Fourth Circuit cases involving Section 1983 First Amendment claims by employees. See e.g. Crouse, 848 F.3d at 580 (employees "forced" to resign), McVey, 157 F.3d at 273 (employee fired), Edwards v. City of Goldsboro, 178 F.3d 231, 237 (4th Cir. 1999) (police officer suspended), and Stroman v. Colleton Cty. Sch. Dist., 981 F.2d 152, 154 (4th Cir. 1992) (teacher fired). Plaintiff's allegations fail, therefore, to meet the first element of a free speech retaliation claim.

**B.    Plaintiff's Complaint fails to satisfy the other required elements of a free speech retaliation claim.**

Assuming *arguendo* that the allegations in Plaintiff's Complaint establish that he suffered an actionable adverse action, Plaintiff's Complaint fails to allege sufficiently *any* of the three

remaining elements for a free speech retaliation claim. Plaintiff's Complaint should, accordingly, be dismissed.

> 1. **Plaintiff did not engage in speech related to a matter of public concern.**

Plaintiff's Complaint fails to state that he engaged in speech that involved a matter of public concern. This deficiency, like Plaintiff's failure to identify a legally sufficient adverse employment action, is fatal to his claim.

As set forth above, the issue of whether the employee was speaking as a citizen or employee on a matter of public concern involves a two-part inquiry wherein a determination is made as to "whether the speech was made as a citizen or pursuant to the employee's duties" and "whether the content of the speech addressed a matter of interest to the community rather than complaints over internal office affairs." Crouse, 848 F.3d at 583 (internal citations and quotations omitted); see also Garcetti v. Ceballos, 547 U.S. 410, 421 (2006), Connick, 461 U.S. at 149. "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti, 547 U.S. at 419. However, when a public employee speaks "as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147 (holding that protections afforded government employees "does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State").

Whether the communication involved constitutes protected speech addressing a matter of public concern is an issue of law and is to be determined by the content, form, and context of the statement. Urofsky v. Gilmore, 216 F.3d 401, 406-07 (4th Cir. 2000), Rankin v. McPherson, 483

U.S. 378, 385 (1987). Speech addresses a matter of public concern if it "affects the social, political, or general well-being of a community." Edwards v. City of Goldsboro, 178 F.3d 231, 246 (4th Cir. 1999). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment." Stroman, 981 F.2d at 156. Communications regarding an employee's own employment grievance, managerial decisions, and interpersonal discord do not address matters of public concern. Brooks, 685 F.3d at 372. "While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Connick, 461 U.S. at 149.

The three communications at issue in the Complaint were not made by Plaintiff as a private citizen or as an employee regarding a matter of public concern. Rather, they relate to Plaintiff's expressions of personal objections regarding managerial decisions and manifestations of internal discord with ELPHD faculty and his personal interests.

First, in a Spring 2016 departmental meeting, Plaintiff expressed concern when a subordinate-ranked faculty member presented a proposal to include a question about diversity in student course evaluations. (D.E. 1 ¶¶20, 22). Plaintiff's comments in that departmental meeting clearly involved an internal issue and did not implicate a public concern beyond the College of Education. See e.g. Dorsett, 940 F.2d at 125 (holding that speech limited to the administration of a college was not a matter of public concern); Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 352 (4th Cir. 2000) ("matters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord, are not treated as matters of public [concern]"), and Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007)

("[p]ersonal grievances [and] complaints about conditions of employment . . . do not constitute speech about matters of public concern.").

For these same reasons, Plaintiff's second alleged expression of speech fails to support a free speech retaliation claim. Plaintiff states that, on April 11, 2018, he emailed a website link to an *Inside Higher Ed* article to the Higher Education faculty at NC State concerning a candidate being considered for hire. (D.E. 1 ¶¶34, 37). In this email, Plaintiff made an off-handed derogatory comment about a colleague's performance as chair of the search committee. (D.E. 1 ¶¶33, 35, 37). Plaintiff's sarcastic comments regarding how the search was handled by a departmental colleague, like Plaintiff's first communication, are not protected speech. See Harris v. Merwin, 901 F. Supp. 509 (N.D.N.Y. 1995) (speech challenging qualifications of another employee does not amount to speech on matter of public concern), Ezuma v. City Univ. of N.Y., 665 F. Supp. 2d 116, 131 (E.D.N.Y. 2009) (challenges to another faculty member's credentials do not implicate a matter of public concern), Barnes v. Small, 840 F.2d 972, 982-83 (D.C. Cir. 1988) (plaintiff's reports of alleged misbehavior of coworkers and superiors was not speech touching upon a matter of public concern), McReady v. OMalley, 804 F. Supp. 2d 427, 439 (D. Md. 2011) (an employee's dissatisfaction with his job duties and staffing decisions of his supervisors is not a matter of public concerns), aff'd, 468 F. App'x 391 (4th Cir. 2012) (opinion).

Finally, Plaintiff purports that he engaged in protected speech on September 3, 2018, when he published a post on his personal blog regarding ASHE. (D.E. 1 ¶47). In this post, Plaintiff says that a "colleague" sent him information about the ASHE conference program and that "I prefer conferences where 1) the attendees and presenters are smarter than me and 2) I constantly learn new things. That's why I stopped attending ASHE several years ago and switched to AEFP." See

20

Motion to Dismiss at Ex. A. The post comments about an exchange with a colleague[9] and is, therefore, related to Plaintiff's employment. Moreover, the substance of the post is nothing more than Plaintiff's personal grievance or interest (i.e., his preference for AEFP over ASHE)—not a matter of interest to the broader community. Brooks, 685 F.3d at 372 (noting how a plaintiff's speech "replete with I's and me's" was simply a personal grievance related to his own dissatisfaction not a matter of public concern). The blog itself and Plaintiff's allegations in the Complaint fail to show that this communication was more than an airing of his personal interest and grievances.

As discussed above, these allegations are legally insufficient to state a claim because none of the speech Plaintiff says he engaged in is protected speech under the First Amendment. Plaintiff's allegations fail, therefore, to meet the second element of a free speech retaliation claim.

### 2. Plaintiff's interest in commenting on matters of public concern did not outweigh Defendants' interest in promoting the efficient operation of its degree programs.

Assuming without admitting that Plaintiff has raised allegations that constitute protected speech by stating a matter of public concern, the Complaint establishes on its face that Plaintiff's interest in the alleged protected speech was not outweighed by the Defendants' interest in promoting the smooth operation of an academic department. This, too, is fatal to Plaintiff's claim.

Even at the 12(b)(6) stage, the Court must balance a public employee's interest in the speech involved with "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150; Joyner v. Lancaster, 815 F.2d 20, 22-23 (4th Cir. 1987) (a question of law, not fact), cert. denied 484 U.S. 830 (1987) . The Fourth Circuit has found the following factors relevant to this balancing test:

---

[9] "Colleague" is defined as "a person who works with you: a fellow worker." See https://www.merriam-webster.com/dictionary/colleague.

> whether the employee's speech: (1) impairs discipline by superiors; (2) impairs harmony among co-workers; (3) has a detrimental impact on close working relationships; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the responsibilities of the employee within the agency; and (9) makes use of the authority and public accountability the employee's role entails.

McVey, 157 F.3d at 278 (internal quotations omitted). "The limited First Amendment interest involved here does not require that [the employer] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Connick, 461 U.S. at 154. The employer need not "prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (quoting Jurgensen v. Fairfax Cnty., 745 F.2d 868, 879 (4th Cir. 1984)).

Plaintiff's allegations demonstrate, on their face, a pattern of objectionable and disruptive conduct on Plaintiff's part which Defendants were legally entitled to address without being subjected to liability. Plaintiff's allegations show that he was removed from the Higher Education Program Area (in which the Master's degree program is housed) because of his negative interpersonal relationships with faculty that affected the ability of the group to function efficiently. (D.E. 1 ¶¶63, 78). He was not removed from the Higher Education Program Area until after: (1) his department head, Defendant Pasque, had counseled him approximately four times about his behavior towards colleagues; (2) he continued to demonstrate the same behavior and even used profanity in a departmental meeting; and (3) he refused to follow Defendant Pasque's recommendation to engage in a community discussion to address student concerns regarding the ASHE conference. (D.E. 1 ¶¶16, 29, 38, 46, 60-63, 74, 78).

Notably, Plaintiff does not assert that Defendants told him to remove any posts from his blog or to stop expressing his opinions regarding social justice. Rather, Plaintiff's own allegations show that the purported adverse employment actions about which he complains were taken only after other behavior separate and apart from his alleged protected speech. What Plaintiff now attempts to construe as restrictions on Plaintiff's speech are, at most, Plaintiff's supervisor's attempts to address Plaintiff's disruptive conduct and student concerns. The Supreme Court has recognized that "[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." Rankin, 483 U.S. at 388. In conducting the balancing test referenced above, the Fourth Circuit has further stressed that "the maintenance of a professional and dedicated teaching staff to provide that service continuously ranks among the State's highest concerns." Stroman, 981 F.2d at 158. Defendants' alleged actions herein are entirely consistent with NC State's mission of providing educational services to its students and its interest in promoting smooth operation within academic departments. Consequently, Plaintiff's allegations fail to satisfy the second prong of a free speech retaliation claim.

3. **Plaintiff's Complaint rebuts a causal connection between Plaintiff's alleged expression of protected speech and Defendants' alleged adverse employment actions.**

In addition to failing to satisfy the elements discussed above, Plaintiff's Complaint also fails to establish that adverse action was taken against him *because he engaged in protected speech*. In order to prevail on his claims, Plaintiff must show that his expressions of alleged protected speech played a "substantial role" in his removal from the Higher Education Program Area and the other alleged adverse actions mentioned in the Complaint. Stroman, 981 F.2d at 156.

23

Here, Plaintiff's Complaint discloses why he was removed from the Higher Education Program Area--and it was not because of alleged protected speech. The Complaint shows that Plaintiff's behavior toward faculty in the Higher Education Program Area predated, and also continued during, Defendant Pasque's term of appointment as Head of ELPHD. (D.E. 1 ¶63). Plaintiff's behaviors are well-documented in the Complaint. (D.E. 1 ¶¶24, 26, 29, 38, 41, 46, 63). By the time Defendant Pasque became Head of ELPHD, a Climate Study had already been conducted wherein Plaintiff was described as a "bully." (D.E. 1 ¶24). Plaintiff references specific comments that he made to faculty which objectively can be perceived as disrespectful, unprofessional, and embarrassing to other faculty. (D.E. 1 ¶¶23, 24, 37, 60). He acknowledges using profanity on at least one occasion. (D.E. 1 ¶60). According to Plaintiff, his blog regarding ASHE was not mentioned by Defendant Pasque until two months after he posted it. (D.E. 1 ¶67). Even then, Defendant Pasque did not reference the blog until after the President of ASHE mentioned it at a conference and NC State students who attended the conference voiced concerns to the department. (D.E. 1 ¶¶66-67). Plaintiff acknowledges that he refused to engage in a community meeting with students about the ASHE conference as requested by Defendant Pasque. (D.E. 1 ¶74). He acknowledges that he was not removed from the Higher Education Program Area until almost seven months after he refused to conduct the community meeting. (D.E. 1 ¶¶67, 74, 77-78). By this time, Plaintiff had been warned on numerous occasions to act appropriately towards other faculty, and the Complaint reveals he failed to do so. (D.E. 1 ¶¶26, 29, 38, 46, 61-62, 64, 77-78).

The timing of events also negates a causal link between Plaintiff's alleged expressions of speech and the alleged adverse employment actions that were said to have occurred in July of 2019. *Eleven months* passed between Plaintiff's last alleged expression of speech (the ASHE blog

on September 3, 2018) and the alleged adverse actions in July 5, 2019. The earlier alleged

expressions of speech (the Spring 2016 departmental meeting and the April 11, 2018 email to

Higher Education faculty) occurred, respectively, approximately *28 months* and *15 months* before

the alleged adverse actions in 2019. The lack of temporal proximity can undermine any conclusion

that events are causally connected.  Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233

(4th Cir. 2006) (unpublished) (finding a three to four month gap "is too long to establish a causal

connection by temporal proximity alone."), Penley v. McDowell Cty. Bd. of Educ., 876 F.3d 646,

656-57 (4th Cir. 2017) (the eight to nine month gap between the teacher's comments and the

adverse action was sufficient to break the causal link for his First Amendment retaliation claim),

Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (thirteen month interval between protected

activity and adverse action not close enough for temporal proximity). "A lengthy time lapse

between the [public official's] becoming aware of the protected activity and the alleged adverse .

. . action . . . negates any inference that a causal connection exists between the two."  Dowe v.

Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998).

Plaintiff's Complaint fails entirely to satisfy the causal connection requirement of his free

speech retaliation claim.  Plaintiff's allegations fail, therefore, to meet *all* of the elements of a free

speech retaliation claim, and Defendants' motion to dismiss should be allowed.

**IV.  Plaintiff's Section 1983 claims against the individual Defendants in their individual capacities are barred by qualified immunity.**

Dismissal of Plaintiff's claims against Defendants Danowitz, Gayles, Lee, and Pasque in

their individual capacities is also appropriate under the doctrine of qualified immunity.[10] Qualified

immunity protects a governmental official from civil liability when his or her "conduct does not

---

[10] Plaintiff's claims against Defendants BOT and Woodson are in their official capacities only.  (D.E. 1 ¶¶7-8).

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Taylor v. Waters</u>, 81 F.3d 429, 433 (4th Cir. 1996) (citations omitted). "Qualified immunity provides an immunity from suit rather than a mere defense to liability[.]" <u>Cloaninger v. McDevitt</u>, 555 F.3d 324, 330 (4th Cir. 2009) (quotation marks and citation omitted).

In examining qualified immunity, the Court determines (1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341, 343 (1986). If there is any legitimate question as to whether an officer's conduct amounts to an abridgement of a constitutional right, the officer is entitled to qualified immunity. <u>Wiley v. Doory</u>, 14 F.3d 993, 995 (4th Cir. 1994). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" <u>Pearson</u>, 555 U.S. at 231. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." <u>Cloaninger</u>, 555 F.3d at 330.

Based on the circumstances and authorities discussed in the preceding sections of this Memorandum, Plaintiff's First Amendment rights were not violated.[11] Assuming *arguendo* that Plaintiff has satisfactorily alleged a violation of his rights, which is denied, it would not have been

---

[11] Because the first two prongs of the <u>Pickering</u> balancing test are questions of law, "an employer is entitled to qualified immunity if either prong cannot be resolved under clearly established law." <u>Crouse</u>, 848 F.3d at 583.

clear to Defendants Pasque, Danowitz, Lee, or Gayles that their alleged actions violated a clearly established First Amendment right. As discussed throughout herein, the Complaint does not allege that these Defendants, or anyone else, restricted Plaintiff's speech. The Complaint is also replete with allegations that Plaintiff had pre-existing interpersonal problems with faculty in the Higher Education Program Area, that others perceived him as a bully, that he used profanity with his colleagues, and that he refused his supervisor's recommendation to address student concerns in a community setting after the President of ASHE criticized him at a conference. The Complaint further reveals that the actions allegedly taken by Defendants did not materially impact his job, restrict his ability to voice his opinions, or change his status as a tenured Professor.

In cases involving free speech claims in the employment setting, courts have indeed found that defendants are entitled to qualified immunity. For example, in <u>Pike v. Osborne</u>, 301 F.3d 182, 185 (4th Cir. 2002), the Fourth Circuit explains:

> We have recognized that in these cases "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, yet difficult to apply, and not yet well defined." <u>Dimeglio v. Haines</u>, 45 F.3d 790, 806 (4th Cir. 1995); <u>see also</u> <u>McVey v. Stacy</u>, 157 F.3d 271, 277 (4th Cir. 1999). Given this "difficult-to-apply" balancing test, we cannot conclude that in this case a First Amendment violation was so clearly established that a reasonable official in Sheriff Osborne's position would know, without having to engage in guesswork, that the plaintiffs' interest in commenting on an issue of public concern outweighed the sheriff's interest in maintaining a loyal and efficient sheriff's department. Because the law in this area was not clearly established at the time the plaintiffs were not reappointed, Sheriff Osborne is entitled to qualified immunity.

<u>Id.</u>, <u>see also</u> <u>Crouse</u>, 848 F.3d at 584 (holding police chief was entitled to qualified immunity on First Amendment claims because he saw two police officers' behavior as a "serious threat to the smooth running of the police department and to his own ability to maintain operational control," and that "it would be difficult for any institution to function when subordinates are engaged in

27

secretive efforts to foment litigation against supervisors with whom they have, for whatever reason, an unfortunate personal chemistry.").

While many of the cases cited above involve the termination of an employee, here, Plaintiff was not terminated, and his job was not materially impacted. Rather, after being warned multiple times, Plaintiff was informed that he was being removed by Defendant Pasque from a departmental practice area and was notified that he would be required to teach a fifth course. Plaintiff was also told to treat faculty better and address student concerns. These allegations are insufficient to plead a violation of a constitutional right. Further, even based on the allegations in the Complaint, a reasonable department head would not, and should not, have known that this conduct could possibly have violated a clearly established constitutional right or, indeed, any of Plaintiff's rights.

The allegations as to the other Defendants are even less compelling than the legally inadequate allegations against Defendant Pasque. Defendant Lee did not become the Head of ELPHD until *after* Plaintiff was told he was being removed from the Higher Education Program Area. (D.E. 1 ¶¶78, 81). Defendant Lee also told Plaintiff he did not have to teach a fifth course. (D.E. 1 ¶83). While Plaintiff asserts in conclusory fashion that Defendant Danowitz was involved in the decision to remove Plaintiff from the Higher Education Program Area (D.E. 1 ¶9), Plaintiff asserts that her only alleged role in the decision was to assign a fifth class to Plaintiff. (D.E. 1 ¶78). Plaintiff specifically asserts that this decision was made due to Plaintiff's reduced departmental workload, not due to his speech. (D.E. 1 ¶78). Defendant Gayles is not and was not Plaintiff's supervisor. She is a peer, a fellow-professor. (D.E. 1 ¶10). While Plaintiff asserts that she is the Program Coordinator of the Higher Education Program Area, the Complaint does not allege that she, as a "Program Coordinator," had the ability to change Plaintiff's placement in a program area or to alter his teaching load. Plaintiff does not assert that Defendant Gayles was

28

involved in any of the actual decisions resulting in his removal from the Higher Education Program Area. Therefore, these alleged actions, as to any of the Defendants, would not put a reasonable school official on notice that their conduct was in violation of the First Amendment. Plaintiff is hard-pressed to claim that this conduct is sufficient to overcome qualified immunity.

As such, in addition to failing to state valid claims against these Defendants, qualified immunity applies, and all claims against them should be dismissed.

## V.      Plaintiff is not entitled to a Declaratory Judgment.

Based on the foregoing arguments, which are incorporated here by reference, Plaintiff's claim for declaratory judgment should be dismissed. Plaintiff's Complaint fails to assert any valid claims against Defendants. As a result, a case or controversy does not exist herein. "A claim is justiciable if the 'conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006) (citation omitted). "A federal court may exercise its jurisdiction in a declaratory judgment proceeding only when 'the complaint alleges an actual controversy between the parties.'" Jones v. Sears Roebuck & Co., 301 F. App'x 276, 282 (4th Cir. 2008) (citation omitted) (unpublished). "When determining whether an actual controversy exists in a declaratory judgment action, the Court must ask 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment.'" Shore Bank v. Harvard, 934 F. Supp. 2d 827, 837 (E.D. Va. 2013) (citation omitted). Because Plaintiff has failed to sufficiently state a case or controversy, his claim for declaratory judgment should be dismissed.

## VI.     Plaintiff's Complaint does not sufficiently state a claim for injunctive relief.

Plaintiff's claim for permanent injunctive relief should also be dismissed. A plaintiff seeking a permanent injunction must demonstrate irreparable harm, inadequacy of purely legal remedies, hardships balancing in its favor, and that the public interest would not be disserved by the injunction. PBM Prod, LLC v. Mead Johnson & Co., 639 F.3d 111, 126 (4th Cir. 2011). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165 (2010). As discussed above, Plaintiff has neither stated a constitutional violation, nor alleged facts suggesting that he is presently sustaining some direct injury or that there is a real and immediate threat of such injury in the future. Such facts are the necessary predicates for a grant of injunctive relief. Therefore, Plaintiff has failed to sufficiently state a claim for injunctive relief, and this Court should deny his request.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion to Dismiss be granted and that Plaintiff's Complaint be dismissed in its entirety with prejudice.

This the 23rd day of November, 2021.

JOSHUA H. STEIN
Attorney General

/s/Vanessa N. Totten
Vanessa N. Totten
Special Deputy Attorney General
N.C. State Bar No. 27905
E-mail: vtotten@ncdoj.gov

/s/Kari R. Johnson
Kari R. Johnson
Special Deputy Attorney General
N.C. State Bar No. 16033
E-mail: kjohnson@ncdoj.gov

30

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
T: (919) 716-6920
F: (919) 716-6764

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT

The undersigned hereby certifies that the foregoing memorandum complies with Rule 7.2(f) of the Local Rules in that, according it does not exceed 30 pages in length, excluding the cover page, signature pages, and certificate of compliance and service pages.

Respectfully submitted this the 23rd day of November, 2021.

JOSHUA H. STEIN
Attorney General

/s/Kari R. Johnson
Kari R. Johnson
Special Deputy Attorney General
N.C. State Bar No. 16033
E-mail: kjohnson@ncdoj.gov

/s/Vanessa N. Totten
Vanessa N. Totten
Special Deputy Attorney General
N.C. State Bar No. 27905
E-mail: vtotten@ncdoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
T: (919) 716-6920
F: (919) 716-6764

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF users, including Samantha K. Harris, sharris@allenharrislaw.com, and Jonathan A. Vogel, jonathan.vogel@vogelpllc.com.

Respectfully submitted this the 23rd day of November, 2021.

JOSHUA H. STEIN
Attorney General

/s/Vanessa N. Totten
Vanessa N. Totten
Special Deputy Attorney General
State Bar No. 27905
E-mail:  vtotten@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6920
Fax: (919) 716-6761

*Counsel for Defendants*