**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――

**No. 22-1712**

―――――

STEPHEN R. PORTER, PH.D.,

            Plaintiff  - Appellant,

    v.

BOARD OF TRUSTEES OF NORTH CAROLINA STATE UNIVERSITY; W.
RANDOLPH WOODSON, in his official capacity; MARY ANN DANOWITZ, in
both her official and individual capacities; JOHN K. LEE, in both his official and
individual capacities; PENNY A. PASQUE, in both her official and individual
capacities; JOY GASTON GAYLES, in both her official and individual capacities,

            Defendants - Appellees,

-------------------------------

ELIZABETH WEISS; PACIFIC LEGAL FOUNDATION; FOUNDATION FOR
INDIVIDUAL RIGHTS AND EXPRESSION,

            Amici Supporting Appellant.

―――――

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh. Terrence W. Boyle, District Judge.  (5:21-cv-00365-BO)

―――――

Argued:  January 27, 2023                                    Decided:  July 6, 2023

―――――

Before WYNN, THACKER, and RICHARDSON, Circuit Judges.

―――――

Affirmed by published opinion. Judge Thacker wrote the opinion in which Judge Wynn joined. Judge Richardson wrote an opinion dissenting.

———————

**ARGUED:** Samantha K. Harris, ALLEN HARRIS PLLC, Narberth, Pennsylvania, for Appellant. Eric M. David, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Jonathan A. Vogel, VOGEL LAW FIRM PLLC, Charlotte, North Carolina, for Appellant. Joshua H. Stein, Attorney General, Kari R. Johnson, Special Deputy Attorney General, Vanessa N. Totten, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. Kathryn D. Valois, Palm Beach Gardens, Florida, Ethan W. Blevins, Daniel M. Ortner, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Amici Elizabeth Weiss and Pacific Legal Foundation. Darpana M. Sheth, Jeffrey D. Zeman, Philadelphia, Pennsylvania, JT Morris, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Washington, D.C., for Amicus Foundation for Individual Rights and Expression.

———————

THACKER, Circuit Judge:

Stephen Porter ("Appellant") filed suit alleging that he suffered adverse employment action in retaliation for unpopular protected speech. The district court dismissed Appellant's complaint. Upon review, we affirm the dismissal because we find that Appellant has failed to allege a causal connection between the only communication that is arguably protected under the First Amendment and the alleged adverse employment action.

I.

A.

Appellant has been a tenured professor at North Carolina State University ("NCSU") since 2011. He teaches courses in graduate-level statistics and research methods in the Department of Educational Leadership, Policy, and Human Development ("the Department"), within the College of Education. At the time Appellant was hired, he joined the Department's Higher Education Program Area ("HEPA"). The HEPA is one of several degree programs within the Department. The Department offers both a master's degree and a doctoral ("Ph.D.") program. There are no undergraduate students in the Department. Appellant has limited involvement with the master's degree program; no master's degree advisees; and does not attend events related solely to the master's degree. Instead, Appellant alleges that, prior to suffering adverse employment action, he spent considerable time on Higher Education Ph.D. activities, including advising HEPA Ph.D. students; serving on HEPA Ph.D. committees; and actively recruiting prospective Ph.D. students.

3

In 2015, the College of Education created a Scholar Leader Ph.D. program. As part of this change, each Ph.D. program within the College of Education became part of the Ph.D. Program Area of Study, which is distinct from a Program Area. Appellant alleges that the change created, "in theory . . . two separate tracks, with [m]aster's degrees and certificates located within the . . . Program Areas, and all Ph.D. programs located within the new Ph.D. Program Areas of Study." J.A. 11.[1] But Appellant alleges that, in practice, the new distinctions were ignored and both master's degree and Ph.D. program matters continued to fall within the parameters of the original Program Areas.

## B.

Appellant's Complaint alleges that he has been outspoken in recent years concerning the focus on "so-called 'social justice' affecting academia in general" and "his concern that the field of higher education study is abandoning rigorous methodological analysis in favor of results-driven work aimed at furthering a highly dogmatic view of 'diversity,' 'equity,' and 'inclusion.'" J.A. 11. In this vein, Appellant identifies three statements or communications he made between 2016 and 2018 which, in his view, are protected speech. According to Appellant, he was eventually subject to adverse employment actions in retaliation for these three communications. Appellant brings his claims against the Board of Trustees of NCSU; the Chancellor of NCSU; Mary Ann Danowitz, former Dean of the College of Education; John K. Lee, current head of the

---

[1] Citations to the J.A. refer to the Joint Appendix filed by the parties in this appeal.

Department; Penny A. Pasque, former head of the Department; and Joy Gaston Gayles, Professor in the Department and Program Coordinator (collectively, "Appellees").

The first communication occurred in spring 2016. Appellant attended a Department meeting regarding a proposal to add a question about diversity to student course evaluations. Appellant expressed his concern about the proposed question (the "survey question incident") and suggested that the proposal had been made without proper research. According to Appellant, the discussion "was amicable in tone, although perhaps embarrassing" to the presenter. J.A. 12. In May 2017, NCSU's Office of Institutional Equity and Diversity issued a report which referenced the survey question incident and labeled Appellant as a "bully." *Id.* Appellee Pasque became head of the Department at the beginning of 2017–2018 academic year and discussed the report with Appellant during a meeting in November 2017. In January 2018, Appellee Pasque emailed Appellant to restate her concerns regarding "bullying" and invited Appellant to respond. Appellee Pasque's email was later included in Appellant's personnel file without his knowledge.

The second communication relates to an April 2018 article published in the journal *Inside Higher Ed*. *See* Colleen Flaherty, *Questions About Job Candidate's Past*, Inside Higher Ed (Apr. 11, 2018), https://perma.cc/U22C-NKKB; https://www.insidehighered.com/news/2018/04/11/anonymous-faculty-members-nc-state-object-job-candidate-who-was-ousted-ohio-state (last visited July 5, 2023). The article criticized a faculty search committee at NCSU chaired by Alyssa Rockenbach, one of Appellant's colleagues in the Department. The day the article was published, Appellant sent an email (the "faculty hiring email") to all of the Department faculty. The email linked

5

the article and said, "Did you all see this? . . . This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work, Alyssa!"  *Id.* at 15.

Appellee Pasque met with Appellant about the faculty hiring email the next week and asked him about his intent in sending the email.  Appellant alleges he was concerned that Rockenbach had "cut corners" in vetting a candidate "out of a desire to hire a Black scholar whose work focused on racial issues."  J.A. 14.  Appellant later learned that Appellee Gayles had forwarded the faculty hiring email to Appellee Pasque and expressed her dissatisfaction.  Appellant also learned that Rockenbach had forwarded the faculty hiring email to Appellees Pasque and Danowitz, as well as to the Associate Vice Provost for Equal Opportunity and Equity.  During a follow up meeting with Appellee Pasque on April 24, 2018, Appellant alleges Appellee Pasque told him "she had spoken with the administration to find ways to exclude [Appellant] from critical aspects of his job. Specifically, she inquired whether [Appellant] had to remain a member of the [HEPA] or whether he could be a member of the department without a Program Area."  J.A. 15. Nonetheless, Appellant received a good annual evaluation that year, albeit with a notation that he, and all faculty, were expected to be collegial.

The final communication occurred on September 3, 2018, when Appellant published a post on his personal blog entitled "ASHE Has Become a Woke Joke."[2]  J.A. 17.  Appellant's "Woke Joke" post mentioned research his colleague had gathered about the topics for discussion at an upcoming ASHE conference.  According to Appellant, this

---

[2] "ASHE" refers to the Association for the Study of Higher Education.

6

research demonstrated that the focus of the conference had shifted from general, post-secondary research to social justice.  Appellant's post concluded with his commentary, "I prefer conferences where 1) the attendees and presenters are smarter than me and 2) I constantly learn new things. That's why I stopped attending ASHE several years ago . . ." *Id.* at 38.  Appellant's blog post generated controversy on social media.

As the 2018–2019 academic year began, Appellee Danowitz met with the HEPA faculty about potentially hiring a new faculty member.  Instead of discussing the candidate as planned at a HEPA faculty meeting, Appellee Pasque invited Appellant to a virtual meeting on October 15, 2018, with herself, Appellee Gayles, and two others.  In that meeting, Appellee Pasque proposed that Appellant leave the HEPA and join a new program area, the Higher Education Policy Program Area, where Appellee Pasque, Appellant, and the new hire would be the only faculty members.  Taken together with their April 24, 2018 meeting, Appellant alleges this was the second time in six months that Appellee Pasque had suggested he leave the HEPA.  Appellant asserts that the meeting then focused on his refusal to leave the HEPA and the impact it had on [the Department's] ability to bring in the new faculty member.  "In frustration at this apparent ambush, [Appellant] said 'Give me a f***ing break, folks. I was the one who said [the potential hire] should come. And now I'm the bad guy because I don't want to leave Higher Ed for a non-existent program area.'" J.A. 19–20.  Appellant received a letter from Appellee Pasque on October 18, 2018, chastising him for his use of profanity and expression of frustration at the meeting.

On November 7, 2018, Appellant received another letter from Appellee Pasque expressing concerns about Appellant's collegiality.  The letter highlighted three things: (1)

7

the 2017 report that referenced the survey question incident and labeled Appellant a bully; (2) the faculty hiring email; and (3) Appellant's use of profanity in response to being asked to leave the HEPA.  The letter made no mention of Appellant's "Woke Joke" blog post. Rather, Appellee Pasque's letter indicated that if Appellant "fail[s] to repair the relationships among faculty in the Higher Education program" or displays a "lack of collegiality" again, Appellant would be removed from the HEPA.  J.A. 20.

One week later, Appellant learned that his "Woke Joke" blog post had been criticized by the president of ASHE during her keynote address at the ASHE conference. On November 19, 2018, Appellant received an email from Appellee Pasque informing him that students in the Department "were having 'strong reactions' to the keynote and that the department 'need[ed] to pay attention to' them."  J.A. 21.  Appellee Pasque proposed a "community conversation about ASHE" where Appellant would be expected to address students' concerns about his blog.  *Id.*  The purpose of the meeting would be "to help graduate students reconcile the 'great teacher' they knew from NCSU with what they had heard about [Appellant] from the president of ASHE."  *Id.*  According to Appellant, Appellee Pasque eventually stated that "only two out of about 60 doctoral students spoke with her about the matter."  *Id.*  On February 19, 2019, Appellant met with Appellee Pasque to discuss the issue further.  During that meeting, Appellee Pasque "repeatedly expressed her frustration that [Appellant] had not proactively addressed student and faculty concerns about 'what happened at ASHE.'"  *Id.* at 22.  Appellee Pasque indicated that this failure to act was another example of Appellant's lack of collegiality.

8

On July 5, 2019, Appellant received his annual evaluation which notified him that Appellee Pasque had removed him from the HEPA because "the Higher Education faculty were not able to make concerted progress" on resolving issues within the Program Area. J.A. 23. And because being removed from the HEPA "reduced [Appellant's] departmental workload," Appellant was notified that he "would be expected to teach a fifth course." *Id.*

In July 2019, Appellee Pasque left NCSU and was replaced by Appellee Lee. After Appellant filed an internal grievance on August 28, 2019 regarding his removal from the HEPA and the added course requirement, Appellee Lee informed Appellant that he would not be required to teach the extra course. But the requirement was not removed from Appellant's personnel file. Appellant alleges that, as a consequence of being removed from the HEPA, he was barred from attending the HEPA orientation for new Ph.D. students, the HEPA welcome cookout, and the HEPA retreat. Appellant also alleges that he was excluded from the Diagnostic Advisement Procedure ("DAP") process for second-year Ph.D. students, including for his own advisees.[3] According to Appellant, this exclusion negatively impacted his ability to advise his students.

In October 2019, Appellant met with Appellee Lee to discuss his ongoing concerns about his exclusion from HEPA Ph.D. activities. Appellant was told he could continue to advise Ph.D. students, but that because of his removal from the HEPA, he would likely not

---

[3] NCSU's Higher Education Student Handbook provides that a student's advisor should be one of two readers reviewing writing samples submitted by student candidates for the DAP and that after those reviews, there should be a meeting of all HEPA faculty members to discuss the students going through the DAP.

9

be able to participate in meetings concerning the DAP process or in reviewing his students' dissertation prospectuses.  Appellant expressed concern that students would not choose him as their advisor if he could not participate in the DAP process or review prospectuses. Appellee Lee responded that this was something Appellant would have to talk to students about.  Appellant also voiced concern that "the process is being set up so that when I go up for my post-tenure review a couple of years from now, I'm not going to have any advisees. And then you and Dean Danowitz can say well, we need to strip [Appellant] of tenure and fire him because he's not fulfilling his job duties." J.A. 26.  Appellee Lee replied, "Right, I hear you." *Id.*

In December 2019, Appellant was prohibited from attending the Ph.D. program admissions meeting, which is when advisees are assigned. And in Spring 2020, Appellant was barred from attending a Ph.D. student recruitment weekend.  Finally, in October 2020, some faculty in the Department proposed a new Ph.D. Program Area of Study in Higher Education Access, Equity, and Justice.  Appellant was not asked whether he would be interested in participating in this new Program Area of Study, and all faculty members with the exception of Appellant were invited to join.  One faculty member who was invited declined to join the new Program Area of Study and remained in the Higher Education Program Area of Study with Appellant.  Appellant and the other faculty member were informed in March 2021 that they could make offers of admission to doctoral candidates they wanted to advise but that those candidates would be encouraged to switch to the new Program Area of Study once they arrived.

C.

Appellant filed his Complaint on September 14, 2021. The Complaint alleges, pursuant to 42 U.S.C. § 1983, Appellant's First and Fourteenth Amendment rights were violated when Appellees removed him from the HEPA, excluded him from HEPA events, and did not invite him to join the new Program Area of Study in Higher Education Access, Equity, and Justice.  In Appellant's view, the survey question incident, the faculty hiring email, and the "Woke Joke" blog post were all protected speech.  He argues that Appellees unlawfully retaliated against him for those communications.

Appellant claims that, with the creation of the new Program Area of Study in Higher Education Access, Equity, and Justice -- from which he was excluded -- he has been effectively siloed into a Program Area of Study that is drained of students and resources. According to Appellant, this has severely compromised his ability to perform critical job duties, such as advising Ph.D. students, leaving his future at NCSU in jeopardy.  Appellees moved to dismiss the complaint in its entirety for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

The district court held -- and Appellant does not dispute -- that his claims for damages against the Board of Trustees and the individual defendants in their official capacities are barred by sovereign and Eleventh Amendment immunity.  The court also determined that Appellant's "requests for injunctive relief regarding his permission to join the new Higher Education Opportunity, Equity, and Justice Program Area of Study and the removal of the requirement that he teach a fifth course are not prospective, and *Ex Parte*

11

*Young*[4] does not provide an exception to Eleventh Amendment immunity." J.A. 47. Finally, the district court held that while Appellant's request for reinstatement may state a claim for prospective injunctive relief, Appellant has failed to state a First Amendment retaliation claim. And, even if Appellant had plausibly alleged a First Amendment retaliation claim, the district court held that the individual defendants would be entitled to qualified immunity.

II.

We review a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) de novo. *See Balfour Beatty Infrastructure, Inc., v. Mayor and City Council of Baltimore*, 855 F.3d 247, 251 (4th Cir. 2017). Likewise, "[w]e review de novo a district court's grant of dismissal under Federal Rule of Civil Procedure 12(b)(6)." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6).

We review "a qualified immunity-based grant of a motion to dismiss *de novo*." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). "To determine whether a complaint should survive a qualified immunity-based motion to dismiss, we exercise 'sound discretion' in following the two-prong inquiry set forth by the Supreme Court, analyzing (1) whether a

---

[4] *Ex Parte Young*, 209 U.S. 123 (1908).

constitutional violation occurred and (2) whether the right violated was clearly established." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

III.

We begin with the district court's determination that Appellant's complaint failed to state a claim for First Amendment retaliation.

"When a government employee claims that he was disciplined because of his speech, we use a three-prong test to determine if the employee's rights under the First Amendment were violated." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (citing *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998)). "The first prong asks whether the employee 'was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest.'" *Id.* The first prong can be further "divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, *Garcetti* [*v. Ceballos*, 547 U.S. 410, 421 (2006)], and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.' *Connick* [*v. Myers*, 461 U.S. 138, 149 (1983)]." *Crouse*, 848 F.3d at 583.

The general rule is that "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. But when it comes to public employees who, as here, are public university professors, the analysis is more nuanced. As this Court has repeatedly recognized, the *Garcetti* rule does not extend to speech by public university faculty

13

members, acting in their official capacity, that is "related to scholarship or teaching." *Id.* at 425; *see Adams v. Trustees of the Univ. of North Carolina-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *see also Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007) (explaining that the Supreme Court "did not decide whether [its] analysis would apply in the same manner to a case involving speech related to teaching"). Thus, if we determine that Appellant was speaking as a public employee, we must then determine whether his speech related to "scholarship or teaching." *Adams*, 640 F.3d at 563. If it did not, then it is unprotected pursuant to *Garcetti*.

On the other hand, "[i]f the speech was made as a citizen and addressed a matter of public concern, the second prong of the test requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services." *Id.* (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty. Ill.*, 391 U.S. 563, 568 (1968)). Thereafter, if the "court determines that the employee's interest outweighed the government employer's interest, the third prong requires a determination that the employee's speech caused the disciplinary action." *Crouse*, 848 F.3d at 583 (citing *McVey*, 157 F.3d at 277–78). "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). "Knowledge alone, however, does not establish a causal connection." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). Though not necessarily required, temporal proximity may create the inference of causation. *See Penley v. McDowell Cnty., Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017). "[G]enerally the

passage of time . . . tends to negate the inference of [causation]" and "[w]here a plaintiff rests his case on temporal proximity alone, the temporal proximity must be very close." *Id.* (internal quotation marks and citations omitted). In any event, the "causal requirement is 'rigorous.'" *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (quoting *Huang v. Bd. Of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990)). "'[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that '*but for*' the protected expression the [state actor] would not have taken the alleged retaliatory action.'" *Id.* (alterations in original) (emphasis supplied).

The district court held Appellant "failed to plausibly allege a First Amendment retaliation claim" because he failed to "plausibly allege that he ha[d] suffered adverse action or that any allegedly protected speech was the 'but for' cause of any alleged adverse employment action." J.A. 51. In doing so, the district court assumed, but did not decide, that the three communications identified by Appellant were protected. Upon review, we have no trouble concluding that at least the survey question incident and the faculty hiring email were unprotected speech.

As to the survey question incident, Appellant's complaint gives no detail as to the content of the speech. Rather, it only alleges that "[c]iting the validity standards of the American Educational Research Association, [Appellant] asked [the presenter] about what work had gone into the design of the question. Survey methodology is one of [Appellant's] areas of research, and he was concerned that . . . [the question] might be harmful to faculty without yielding useful information." J.A. 12. This amounts to a description of

Appellant's perspective as to his duties as an employee. Indeed, Appellant himself describes the survey question incident as "nothing more than doing his job." *Id.* at 13. This clearly does not equate to a matter of public concern. Therefore, because Appellant was speaking as an employee, we must determine whether his speech related to scholarship and teaching. We readily conclude that it did not. Appellant was not teaching a class nor was he discussing topics he may teach or write about as part of his employment. Though Appellant mentioned that survey methodology was his personal area of study, this is not enough to convert the speech, in the context of merely "doing his job," into a matter of scholarship. In excluding "speech related to scholarship and teaching," the court recognized a concern that "the teaching of a public university professor" could become the basis for adverse action if it was unprotected pursuant to the general rule. *See Garcetti*, 547 U.S. at 425, 438. While Appellant's speech here was in his capacity as an employee, it was not a product of his teaching or scholarship. Therefore, it is unprotected.

The same is true for the faculty hiring email. There, Appellant's speech consisted of asking, "Did you all see this," linking the *Inside Higher Ed* article, and sarcastically saying, "This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work Alyssa!" J.A. 15. The faculty hiring email expressed no viewpoint and made no mention of policy or anything else that might be of public concern. Instead, it was an unprofessional attack on one of Appellant's colleagues, sent only to other faculty members within the Department. And it plainly was unrelated to Appellant's teaching or scholarship.

On these facts, we are convinced that both the survey question incident and the faculty hiring email are not protected speech. Both instances were wholly internal communications and the facts as Appellant alleges them demonstrate that he was speaking "as an employee" rather than a citizen. *Crouse*, 848 F.3d at 583 (citing *McVey*, 157 F.3d at 277). Appellant's communications addressed "matter[s] of personal interest" and "complaints over internal office affairs," rather than matters of public concern. *Id.* (citations omitted). And, Appellant's speech was not related to his scholarship or teaching. Therefore, neither the survey question incident nor the faculty hiring email are protected speech.

As to the "Woke Joke" blog post, even assuming, as the district court did, that it amounted to protected speech, Appellant fails to allege a sufficient causal connection to state a claim for retaliation. As to temporal proximity, Appellant published the blog post on September 3, 2018. NCSU made no mention of the post until November 19, 2018, when Appellee Pasque emailed Appellant about students' reactions to the ASHE conference. And Appellant was not removed from the HEPA until July 5, 2019 -- ten months after the blog post was published and nearly eight months after Appellee Pasque first emailed Appellant regarding the post. Under these circumstances, temporal proximity is lacking.

Beyond this, the complaint itself fails to allege that the blog post was the "but for" cause of the alleged adverse employment action. *See Raub*, 785 F.3d at 885. Appellant's complaint makes clear that he was removed from the HEPA because of his ongoing lack of collegiality -- not because of the content of his blog post. For example, Appellant was labeled as a bully because of the survey question incident. And the complaint admits that

Appellee Pasque "implied there were other claims about [Appellant] in the [2017 report]" beyond the survey question incident.  J.A. 13.  The complaint also alleges that in the meeting where Appellant was asked to join a new Program Area, he became "frustrated" and said "Give me a f***ing break, folks. . . ."  *Id.* at 19.  The complaint alleges that after this meeting, Appellant received letters from Appellee Pasque "chastising him for his use of profanity and his expressions of frustration" and again "expressing concern about his 'collegiality.'"  *Id.* at 20.  Continuing on, the complaint admits that Appellant was warned that if he "'fail[ed] to repair the relationships among faculty in the Higher Education program' or display[ed] a 'lack of collegiality' again," he would be removed from the HEPA.  *Id.*

Even as to the "Woke Joke" blog post, the complaint makes clear that Appellee Pasque's concerns were not with the content of the post, but rather with Appellant's failure to "proactively address[] student and faculty concerns about 'what happened at ASHE.'" J.A. at 22.  And finally, the complaint alleges that Appellant was removed from the HEPA "because 'the Higher Education faculty were not able to make concerted progress' on resolving issues within the Program Area."  *Id.* at 23.

Taking all of this together, we cannot conclude that Appellant has sufficiently alleged that the "Woke Joke" blog post was a "but for" cause of his removal from the HEPA.

IV.

Appellant's complaint fails to sufficiently allege a First Amendment retaliation claim.  We hold that the survey question incident and the faculty hiring email were not

18

protected speech. Even assuming the "Woke Joke" blog post was protected speech, Appellant has failed to allege that it was a "but for" cause for any alleged adverse employment action. Therefore, the district court's order dismissing Appellant's complaint for failure to state a claim is

*AFFIRMED.*

19

RICHARDSON, Circuit Judge, dissenting:

Over a century ago, a Massachusetts policeman filed suit, claiming that he was fired for speaking his mind. In dismissing his suit, Justice Holmes famously quipped: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517 (Mass. 1892). Yet—like many Holmesian aphorisms—that is no longer our law. It is now well-settled that "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014). Today, when a state employer retaliates against its employee for speaking as a citizen on a matter of public concern, the First Amendment demands that the state justify its action.

Stephen Porter, a professor at North Carolina State University, says that the University retaliated against him for his protected speech. My friends in the majority say otherwise. They hold that much of Porter's speech was not protected at all, and that—for his speech that was protected—Porter has not drawn a plausible link to the adverse action that he suffered.

My friends err at both steps. Porter was indeed speaking as a citizen on a matter of public concern. And—based on his complaint's allegations—it is plausible that the University retaliated against him because of it. The University thus must put forth evidence to justify its action. But, at this early stage of litigation, the government has not made that showing. So we should allow Porter's suit to proceed.

20

## I.    Background

Stephen Porter has been a tenured professor at North Carolina State University for over a decade.  His home within the University is the College of Education—specifically, the Department of Educational Leadership, Policy, and Human Development—where he advises doctoral students and teaches graduate-level research-methods courses.

Over the past several years, Porter has been increasingly critical of the direction that his academic field has taken.  And his criticisms, he says, have not endeared him to the University's administrators.  This case specifically is about three instances when Porter says that he engaged in protected speech, for which he claims that the University retaliated against him:  (1) comments that he made at a faculty meeting, (2) an email that he sent to fellow faculty members, and (3) a blog post that he wrote.[1]

### A.    Porter's speech

Our story begins in the spring of 2016, at a faculty meeting.[2]  During the meeting, a Department member proposed adding a question about diversity to student course evaluations.  Porter, however, was concerned and made it known.  He thought that "the department was rushing to include a question that had not been properly designed and thus might be harmful to faculty without yielding useful information."  J.A. 12.  So, citing "validity standards," he pressed the presenter on what work went into the design of the

---

[1] Porter named a coterie of administrators—along with the University's Board of Trustees—as defendants in his suit.  For simplicity's sake, I will refer to defendants collectively as the "University."

[2] Because this case is at the Rule 12(b)(6) stage, I take the facts as Porter's complaint presents them, drawing all reasonable inferences in his favor.

21

question.  J.A. 12.  Porter describes the resulting discussion as "amicable in tone."  J.A. 12.
But he admits that it was "perhaps embarrassing" for the presenter, because her lack of
"consideration or testing for validity and reliability" "became apparent."  J.A. 12.  Porter's
comments at the faculty meeting are the first instance of speech at issue.

The second instance came two years later, near the end of the academic year in April
2018.  Then, Porter emailed other faculty members a link to a news article about a
Department colleague, Alyssa Rockenbach.  The article was critical of Rockenbach's
search process for a new faculty member.  In particular, it criticized her for conducting the
search with "unusual secrecy," and for focusing on a professor who had recently been
terminated from another university for alleged professional misconduct (including an
inappropriate relationship with a student).  J.A. 14.  To Porter, Rockenbach had "cut
corners" in "vetting" the professor because she had a "desire to hire a Black scholar whose
work focused on racial issues."  J.A. 14.  So he emailed the article to other Department
faculty, with his own sarcastic commentary included:  "Did you all see this? . . . This kind
of publicity will make sure we rocket to number 1 in the rankings.  Keep up the good work,
Alyssa!"  J.A. 15.

The third speech instance occurred after school had resumed the following fall,
when Porter published a post on his personal blog in September 2018.  His post, titled
"ASHE Has Become a Woke Joke," criticized an upcoming conference hosted by
"ASHE"—the Association for the Study of Higher Education.  J.A. 17.  In Porter's view,
"the focus of the conference had shifted from general post-secondary research to a focus
on social justice."  J.A. 17.  So his blog post cited a colleague's research on the conference's

topics, which—to his eyes—suggested a lack of academic rigor.  The research found that terms like "qualitative," "identity," "diversity," "inclusion," "oppress," and "privilege" came up more often than terms like "quantitative," "regression," "propensity score," and "quantile."  J.A. 37–38.  Porter ended his blog post by making his position on attendance clear:  "I prefer conferences where 1) the attendees and presenters are smarter than me and 2) I constantly learn new things.  That's why I stopped attending ASHE several years ago."  J.A. 38.

### B.    The University's response

Porter's blog post immediately created a stir online.  And the University's own reaction to it would come soon enough.  But that was just the tipping point.  By that time, the University had already responded at each step along the way.

Unbeknownst to Porter, his faculty-meeting comments earned him a demerit in the University's 2016–2017 academic year report, which had labeled him a "bully" based on his comments.  J.A. 12.  That accusation came up again during the fall semester of the 2017–2018 academic year, when the new Department head—Penny Pasque—came by Porter's office under the guise of a get-to-know-you meeting.  During the meeting, she accused Porter of "bullying" his colleagues—a charge that she repeated in an email that she sent him a few months later.  J.A. 13.  When Porter asked for examples of his alleged "bullying," she cited only his faculty-meeting comments.

Porter's faculty-hiring email from that spring engendered a similar response.  Both Rockenbach—the email's subject—and another of Porter's colleagues forwarded Pasque a copy.  The next week, Pasque again requested to meet with him.  At the meeting, she

"repeatedly asked him" why he sent his email.  J.A. 15.  And it was only two weeks later, at a follow-up meeting, when she first suggested that Porter leave his program area within the Department.  Porter was "dismayed" and "disturbed," as he thought that being removed from his program area would "severely marginalize" him from the other faculty and his Ph.D. advisees.  J.A. 16.  Though his annual evaluation that year was good, it cautioned Porter to be "collegial."  J.A. 17.

Things came to a head the following fall after Porter's blog post.  A little over a month after the post—and in the wake of the controversy that it generated—Pasque once again suggested removing him from his program area, this time in front of his colleagues at another faculty meeting in October.  This was the second time in six months that she'd made this suggestion:  first, after Porter's email, and second, after Porter's blog post.  Although the meeting was ostensibly about whether to hire a new professor, Porter says that its focus quickly shifted to why he would not leave his program area.  In frustration, Porter responded:  "Give me a fucking break folks.  I was the one who said [the new professor] should come.  And now I'm the bad guy because I don't want to leave Higher Ed for a non-existent program area."  J.A. 19–20.

Pasque sent Porter a letter a few days later, "chastising" him "for his use of profanity" during the meeting.  J.A. 20.  And the next month, in November, she sent him another letter, once again criticizing Porter's "collegiality."  J.A. 20.  According to Porter, as evidence of his "collegiality" problem, Pasque's November letter specifically cited his faculty-meeting comment and his email, along with his "response to being asked to leave [his program area]" a month earlier.  J.A. 20.  Pasque concluded her letter by saying that,

24

if Porter did not "repair the relationships among faculty," then she would remove him from the program area against his will.  J.A. 20.

She followed through on this promise at the end of the school year.  In Porter's annual evaluation that summer, Pasque said that she was removing him from the program area because "'the Higher Education faculty were not able to make concerted progress' on resolving issues."  J.A. 23.

This decision followed a long disagreement about how Porter ought to respond to the controversy that his blog post had generated.  A week after Pasque sent her November letter criticizing Porter's "collegiality," she suggested that he conduct a "community conversation" about his blog post since it had supposedly provoked "strong reactions" from the graduate students.  J.A. 21.  When Porter pressed her on how many students had concerns, she told him that it was only two out of the sixty doctoral students.  So he demurred on having a public event, but offered to speak privately with any students who had concerns.  And he suggested that the Department's faculty discuss further whether a public event was warranted when they met after the holidays.

But the topic did not make the agenda.  Instead, Pasque met privately with Porter in February, where she "repeatedly expressed her frustration that [he] had not proactively addressed student and faculty concerns about 'what happened at ASHE'"—the conference that Porter's blog post had criticized—and "cited [Porter's] lack of proactive action as a further example of" the "lack of collegiality" that she had described in her November letter. J.A. 22.

### C.    Porter's lawsuit

After the University removed Porter from his program area, his worst fears were realized.  For the following school year, he found that his removal resulted in his "near-total exclusion from Ph.D. activities," which meant that he could not recruit, or be assigned, any new doctoral advisees.  J.A. 27.  And he was even prohibited from participating in key evaluations of his then-existing advisees.

Porter's exclusion continued the next year when the Department formed a new program area for doctoral students.  All the previous program area's members were invited to join except for Porter.  He saw this as yet another impediment to getting new Ph.D. advisees.  And the University confirmed his suspicions when the Department head told Porter that he "could make offers of admission to doctoral candidates," but that "those candidates would be encouraged to switch away from [him] . . . to the new [program area]."  J.A. 29.  By then, it was clear to Porter that recruiting new doctoral advisees would be nearly impossible.  Since advising doctoral candidates was one of the "core requirements of his job," this jeopardized his tenure.  *See* J.A. 29.

So Porter sued the University, seeking damages and injunctive relief.  After the University moved to dismiss, the district court sided with the University and dismissed Porter's claims.  Porter timely appealed.

### II.    Discussion

The First Amendment famously provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  But its protection doesn't end at Congress's laws.  Through the Fourteenth Amendment, this guarantee also ensures against

intrusion by the states.  *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).  And it extends to times when, rather than directly prohibiting speech, the government retaliates against a citizen for engaging in it—including by taking an adverse employment action against a public employee.  *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 596–97 (1972).

Most free speech cases follow essentially the same path.  The first step is to figure out whether the citizen engaged in protected speech.  *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358–59 (2003) (discussing unprotected-speech categories, including fighting words, incitement, and true threats).  Next, a court must determine whether the government restricted the citizen's ability to engage in that speech.  *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (noting that laws regulating conduct may also have "incidental limitations" on expression).  If a claim survives these two steps, then we proceed to a third: The government bears the burden to produce evidence showing that its speech restriction was nonetheless justified under the appropriate level of means-end scrutiny.  *See, e.g.*, *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 & n.7 (4th Cir. 2023).

When a public employee asserts that his employer has retaliated against him in violation of the First Amendment, we apply three winding steps that roughly conform to these contours.  *See McVey v. Stacy*, 157 F.3d 271, 277–79 (4th Cir. 1998); *Adams v. Trustees of the Univ. of N. Carolina–Wilmington*, 640 F.3d 550, 560–64 (4th Cir. 2011).

First, we must make a "threshold inquiry" into whether the employee engaged in protected speech.  *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc).  Although the majority blurs the lines, this initial inquiry involves two distinct questions: (1) was the plaintiff speaking as an employee; and (2) was he speaking about a matter of

public concern?  *Garcetti*, 547 U.S. at 421–22.  The first question—whether he was speaking as an employee—boils down to whether the plaintiff made his speech pursuant to his "official duties."  *Id.* at 421.  If so, then he was acting as a governmental mouthpiece and is not entitled to First Amendment protection.[3]  *See id.*; *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017).  Such speech was effectively the government's speech, and the government may "exercise . . . control over what [it] itself has commissioned or created."  *Garcetti*, 547 U.S. at 422.  But, if the plaintiff did not speak pursuant to his official duties, then he spoke as a citizen and we must ask the second question:  whether the content of his speech addressed "matters of public concern."  *See Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 343 (4th Cir. 2017) (noting that "a matter of public concern" includes "an issue of social, political, or other interest to a community" (quoting *Urofsky*, 216 F.3d at 406)).

If the answer to both questions is yes—*i.e.*, the plaintiff spoke as a citizen upon a matter of public concern, and thus engaged in protected speech—then we move on to the second step:  did the government restrict that speech?  In other contexts, this question is

---

[3] As the majority recognizes, *see* Majority Op. at 13–14, our precedent suggests that *Garcetti*'s rule—which withdraws First Amendment protection from speech made pursuant to a state employee's official duties—does not apply to speech that public university professors make as part of their "scholarship or teaching."  *See Adams*, 640 F.3d at 562–64.  Such teaching or scholarship, even if nominally part of a professor's official duties, is not attributable to the government as *Garcetti* intended.  *Id*.  In other words, though professors' official duties may involve producing scholarship and teaching students, their speech while doing so is still protected.  *See Meriwether v. Hartop*, 992 F.3d 492, 504–07 (6th Cir. 2021).  Because I find that Porter was not speaking pursuant to his official duties, I need not consider the scope of any exception for duties related to scholarship or teaching.

easy. For example, prior restraint obviously restricts speech. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 711–13 (1931). But retaliation is more nuanced, since the government is not regulating speech directly. Instead, the censorship is indirect. The employee can speak, but only under threat of government punishment. So the employee often chooses not to speak at all. *See Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("[T]he threat of dismissal from public employment is . . . a potent means of inhibiting speech." (cleaned up)).

Thus, in the public employment retaliation context, indirect censorship takes the form of an adverse employment action. And, to show that their speech has been indirectly censored, employee-plaintiffs must demonstrate "a sufficient causal nexus between the protected speech and the retaliatory employment action." *Ridpath v. Bd. of Governors*, 447 F.3d 292, 316 (4th Cir. 2006); *see also McVey*, 157 F.3d at 278 (explaining that speech must be a "substantial factor" in an adverse employment action to make out a retaliation claim). Generally, such a plaintiff must show that, "but for" his protected speech, he would not have suffered the adverse action.[4] *See Ridpath*, 447 F.3d at 316 n.26 (citing *Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990)).

---

[4] A plaintiff may make this showing by relying on the burden-shifting framework from *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977). That framework allows us to presume but-for cause where the plaintiff establishes that his protected speech was a "motivating factor" in his adverse action, unless the government proves "by a preponderance of the evidence that it would have reached the same decision" absent that speech. *Id.* at 287; *see also Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 654 (4th Cir. 2017) (discussing the relationship between *Mt. Healthy*'s burden-shifting framework and the but-for causation requirement).

29

If the plaintiff's claim passes these two steps, then we proceed to the third and final step, where the government must justify its restriction using means-end scrutiny. *See Smith v. Gilchrist*, 749 F.3d 302, 309 (4th Cir. 2014) (citing *Rankin*, 483 U.S. at 388). The form of scrutiny that we use to evaluate retaliation claims by public employees is the so-called *Pickering-Connick* interest balancing. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 548 (1968); *Connick v. Myers*, 461 U.S. 138, 149–50 (1983). That test requires us to weigh three interests. On one side of the ledger are the employee's interest in speaking and the "public interest in having free and unhindered debate on matters of public importance." *Pickering*, 391 U.S. at 573; *see also Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016). We weigh those interests against the university's interest as an employer in "promoting the efficiency of the public services it performs through" that employee. *Pickering*, 391 U.S. at 568; *see also Connick*, 461 U.S. at 150.

Throughout our three-step inquiry, we cannot forget that Porter's suit was dismissed at the pleading stage. We thus must take all the facts that he alleged in his complaint as true, drawing all reasonable inferences in his favor. *See Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). And, in the end, our question is simply whether his claims can *plausibly* survive at each step. *See id.*

## A.    Porter engaged in protected speech

Contrary to the majority's terse conclusions, each one of Porter's three speech instances—his faculty-meeting comments, his faculty-hiring email, and his blog post— constitutes protected speech. That is because, in each instance, he was speaking as a citizen on a matter of public concern.

30

Start with what's easiest: Porter's blog post. The majority wisely does not contest that it is protected speech under *McVey*. Writing a post in your own time, on your personal blog, is speaking as a citizen rather than pursuant to your official duties as an employee. And the blog post's subject was doubtless a matter of public concern. After all, Porter alleged that the blog post generated controversy on Twitter, at the conference that it criticized, and at the University itself. That's little surprise. Just searching the terms "woke college" on Google would confirm that Porter's blog post fell well within a lively public debate.

Porter's faculty-meeting comments and his faculty-hiring email are slightly closer calls. But only slightly. As to the former, it is true that Porter made his comments at an internal faculty meeting where the public was not present. Yet the mere fact that a plaintiff chooses to speak "inside his office, rather than publicly," does not mean that he is speaking as an employee instead of a private citizen. *Garcetti*, 547 U.S. at 420; *Givan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413–16 (1979). And, though Porter's question had to do with a topic within his professional expertise—survey design—it is also irrelevant that the "subject matter" of his speech was "related to [his] job." *Garcetti*, 547 U.S. at 421.

Instead, the "critical question" in distinguishing speech made as an employee from speech made as a citizen is "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Lane*, 573 U.S. at 240. In other words, we ask whether Porter "was fulfilling a responsibility imposed by his employment" when he objected to the diversity question that a colleague proposed adding to student surveys. *See Kennedy v.*

31

*Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022).  And it is hard to believe that Porter had a *duty* or a *responsibility* to make his objection.

Indeed, "[t]he majority engages in no meaningful inquiry into [Porter's] official duties" as a professor.  *See Crouse*, 848 F.3d at 588 (Motz, J., concurring in the judgment).  If my friends claim that Porter was acting pursuant to his official duties, then "there must have been some job duty" that he was "supposedly carrying out."  *See id.*  Yet the majority points to none.  The closest that they get is by noting that Porter, in his complaint, described his faculty-meeting comment as "nothing more than doing his job."  Majority Op. at 16 (quoting J.A. 13).  But this is a common figure of speech.  Superman deflects praise by saying that he's "just doing his job," even though the citizens of Metropolis never cut him a paycheck.  Reading Porter's complaint in the light most favorable to him—as we are required to do at this stage—it is *plausible* that he had no official responsibility to lodge his objection.  *See Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009).  Accordingly, when he did so, he was speaking as a citizen, not as an employee.[5]

Moving to the next question at this threshold step, Porter's faculty-meeting comment also addressed a matter of public concern.  Again, he made it in response to a

---

[5] The majority in *Crouse* perhaps suggests that—even when a state employee did not have an *actual* duty to undertake the speech—if a reasonable member of the public observing the speech may have *imputed* it to the government, then that might alone render his speech unprotected under *Garcetti*'s "official duties" rule.  *See Crouse*, 848 F.3d at 585 (noting that the plaintiffs "were clearly identified as police officers" to the public).

I tend to agree with Judge Motz that, to the extent that we've hinted at such a rule, it deviates from *Garcetti* and its progeny at the Supreme Court.  But, even if we did have such a rule, it would not apply to Porter's faculty-meeting comment, which the public never heard.

32

colleague's proposal to "add a question on diversity to student course evaluations." J.A. 12. Porter's worry was that, "in response to social pressure, the department was rushing to include a question that had not been properly designed." J.A. 12. So he asked about the testing that went into the diversity question.

Unquestionably there has been a growing, and wide-ranging, public debate about how colleges ought to emphasize diversity, equity, and inclusion. *Cf. Adams*, 640 F.3d at 565. Though the exact words Porter used in the faculty meeting are not in the record, reading his complaint in the light most favorable to him shows that its subject matter was well within the realm of this public debate. And anything that "involves an issue of social, political, or other interest to a community" involves a matter of public concern. *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004). Thus, because Porter made his faculty-meeting comment as a citizen, and because it was on a matter of public concern, it is protected speech.

The same is true of Porter's faculty-hiring email. This time, we do have the exact words that he used. He linked to an article criticizing a colleague's hiring decisions, saying, "Did you all see this," before sarcastically adding: "This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work, Alyssa!" J.A. 15. As with his faculty-meeting comment, there are no grounds to think that he had a duty to send this email; the very notion strains credulity. So, as with the faculty-meeting comment, he sent his email in his capacity as a citizen, not as an employee.

His email, like his faculty-meeting comment, was also on a matter of public concern. The article that he linked to apparently criticized his colleague for conducting her hiring

33

process with "unusual secrecy," and for including among the finalists a former professor who was fired from his previous job after allegations emerged that he was misusing the university's staff for personal business, and that he had "an inappropriate relationship with a student." J.A. 14.

Even were we to set aside Porter's concern that his colleague "cut corners [in] vetting" the finalist "out of a desire to hire a Black scholar whose work focused on racial issues," J.A. 14, news that the University almost hired someone who faced these serious allegations would alone interest the public. *Cf. Lane*, 573 U.S. at 240 ("The importance of public employee speech is especially evident in the context of this case: a public corruption scandal."). And the public has also increasingly scrutinized relationships between two parties who are subject to a power imbalance (like a professor and a student). Indeed, the very fact that the topic of Porter's speech was the subject of a news article may alone render it a matter of public concern—after all, what media company would publish a news article about something that wasn't newsworthy? *Cf. City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest.").

The majority counters with two retorts: Porter's email (1) was "sent only to other faculty members" and (2) "was an unprofessional attack on one of [his] colleagues." Majority Op. at 15–16. Both are irrelevant. As discussed above, when asking whether a person spoke as an employee or as a citizen, it makes no difference whether the speech reached the public. *See Givhan*, 439 U.S. at 413-15. And that question is also inapposite to deciding whether the speech's *subject matter* addressed the sort of thing that the public would find interesting. While the venue might be relevant when we balance the interests

34

at stake, it does not bear on the threshold inquiry of whether Porter was speaking as a citizen on a matter of public concern. *See Ufrosky*, 216 F.3d at 407 ("[T]he place where the speech occurs is irrelevant: An employee may speak as a citizen on a matter of public concern at the workplace." (cleaned up)).

So too with the charge that Porter's email was an "unprofessional attack." The Supreme Court has been clear: "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387. Instead, it is canon that "debate on public issues . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The Court went so far as to hold in *Snyder v. Phelps*, 562 U.S. 443 (2011), that picketing a military funeral with signs reading "Thank God for 9/11," "God Hates Fags," and "You're Going to Hell" was still speaking on a matter of public concern. *See id.* at 454. To call those messages "particularly hurtful," as the Court did, *id.* at 456, is a gross understatement. And Porter's sardonic email does not come remotely close to those messages. *See Muller v. Fairfax Cnty. Sch. Bd.*, 878 F.2d 1578, 1583 (4th Cir. 1989) ("[The] use of satire to comment on a matter of public concern d[oes] not deprive [an individual] of the protection afforded by the first amendment."). But even if it did, it would not matter at this stage. A message's form is distinct from its subject matter. In *Snyder*, the protestors' vitriol made no difference to the fact that their message addressed a matter of public concern. The same is true here.

**B.    Porter plausibly alleged that he suffered retaliation because of that speech**

Since Porter engaged in protected speech, we turn to whether he suffered retaliation because of it.  The retaliatory act, Porter says, was removing him from his old program area, and then refusing to admit him to the new one, thus interfering with his ability to interact with his current advisees, making it almost impossible to recruit new ones, and putting his tenure in jeopardy.  And he easily satisfies the causation requirement, since—according to his complaint—Pasque explicitly mentioned both his faculty-meeting comment and his faculty-hiring email in her November letter threatening to remove him.  So when she followed through on her threat the following summer, it's reasonable to conclude that the reasons that she listed in her initial letter—which included two instances of protected speech—were all but-for causes of her later decision.  *See Ridpath*, 447 F.3d at 318–19.

For much the same reason, Porter's blog post was also a but-for cause of his removal from the program area, even if the connection is somewhat more attenuated.  When Pasque made her November threat, she cited his "collegiality" as her concern, and said that she would remove him if he did not "repair relationships among faculty" in the Department.  J.A. 20.  After her November letter, there was—at least, according to the complaint—only one other instance of "un-collegiality" that Pasque cited:  Porter's hesitation to hold a "community conversation" discussing his blog post.  J.A. 21.  In February, she met with Porter and "expressed her frustration that [he] had not proactively addressed student and faculty concerns" about the controversy that his post had caused at ASHE, the conference

that it had criticized. J.A. 22. So, taking Porter's complaint at its word, and drawing all reasonable inferences in his favor: But for his blog post, Pasque would not have asked Porter to hold a "community conversation," and but for his hesitation to do so, she would not have removed him from his program area. That's but-for cause, even with the blog post standing alone.[6]

---

[6] The majority, of course, disagrees that the faculty-meeting comment and the faculty-hiring email are protected speech. So they only ask whether Porter showed that his blog post was, plausibly, a but-for cause of his removal from his program area. And they conclude that he has not made an adequate showing. Their analysis focuses on the "temporal proximity" between his blog post and his removal, which they say was "lacking," since Porter was not removed until ten months after he published his post. Majority Op. at 17. But even if I accept the majority's premises (and I do not), their conclusion does not follow.

Let's review the timeline. Porter published his blog post in September. Pasque suggested that he leave his program area at the October faculty meeting, and formally threatened to remove him in her November letter. Finally, she followed through on her threat in July, when she gave Porter his annual evaluation. It is true that ten months elapsed between the post and the removal. But we have found a similar gap to be sufficient at the motion-to-dismiss stage where a plaintiff shows that the employer "knew of the protected activity" and then took the adverse action "at the first available opportunity." *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). And here, it's plausible that, although Pasque learned of Porter's blog post in the fall, she waited until the summer to remove him from his program area, perhaps because it would not have been practicable to remove him in the middle of the school year.

More critically, the majority focuses on the wrong period. Though Pasque did not actually remove Porter until July, she first threatened to do so in November: only two months after he published his blog post. And she suggested that he leave the program area even earlier, at the October meeting: only one month after the post. So the temporal proximity between his post and her threats was actually quite close. *Cf. Constantine v. Rectors and Visitors*, 411 F.3d 474, 501 (4th Cir. 2005) (concluding that a four-month gap was sufficiently close temporal proximity to allow a retaliation claim to survive a motion to dismiss).

37

### C.     The University has not produced sufficient evidence to justify its action

Having concluded (1) that all three instances of Porter's speech were protected, and (2) that the University restricted his speech by retaliating against him because of it, the University must show (3) that its decision to remove him from his old program area (and to bar him from the new program area) was justified under *Pickering-Connick* interest balancing. Again, that balancing test requires us to weigh Porter's interest in speaking (alongside the public's interest in his speech) against the government's interest in restricting it. *See Garcetti*, 547 U.S. at 417–19.

Consider first the government's interest in providing efficient services to the public. In doing so we recognize that the government's "interests as an employer" differ from its interests in regulating "the citizenry in general." *Pickering*, 391 U.S. at 568. When acting as an employer, the government must have "discretion and control over the management of its personnel and internal affairs," including "the prerogative to remove employees whose conduct hinders efficient operation." *Connick*, 461 U.S. at 151 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) (Powell, J., concurring)). To evaluate this interest, we have pointed to an array of potentially relevant factors. *See McVey*, 157 F.3d at 278.[7]

---

[7] These factors include "whether the employee's speech (1) 'impairs discipline by superiors'; (2) impairs 'harmony among co-workers'; (3) 'has a detrimental impact on close working relationships'; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the 'responsibilities of the employee within the agency'; and (9) makes use of the 'authority and public accountability the employee's role entails.'" *Id.* (quoting *Rankin*, 483 U.S. at 388–91).

Critically, the government's interest as an employer varies with context: A police department has different interests in controlling its employes than a public university does. *See Ridpath*, 447 F.3d at 317 (noting that "we must take into account the context of the employee's speech and the extent to which it disrupts the operation and mission of the institution" (cleaned up)); *Jurgensen v. Fairfax Cnty.*, 745 F.2d 868, 880 (4th Cir. 1984) (analyzing the state's interest in "discipline" "on a spectrum," with "university professors at one end" and "police on the other"). So here we must look through the lens of a university and its mission. A police force is "paramilitary," so "discipline is demanded, and freedom must be correspondingly denied." *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (cleaned up). But dispute and disagreement are integral, not antithetical, to a university's mission. *Cf. Jurgensen*, 745 F.2d at 880.

In any event, we need not conduct a full contextual analysis of the government's asserted interests at this stage. Whenever the government restricts protected speech, it must justify those restrictions with *evidence* that they furthered its legitimate interests. *See Sharpe*, 59 F.4th at 681–82 & n.8 (allowing a First Amendment challenge to proceed past the motion-to-dismiss stage because the government had not demonstrated how the restriction at issue was tailored to its legitimate interests). The University can point to "common sense and caselaw to establish . . . a valid interest," but "'mere conjecture' is inadequate." *Id.* at 681 (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000)); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969) (noting that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" in schools).

39

Here, there is scant evidence to support the University's asserted interest. *See Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013) (rejecting mere "lip service to ostensible damage to office morale, relationships between colleagues, and the function of the office generally" without "articulat[ing] any way in which the [environment] would have been different or was actually different due to [a plaintiff's] statements"). That is unsurprising, since we are at the Rule 12(b)(6) stage, and so are limited to the allegations in Porter's complaint. And we must read those factual allegations in a light most favorable to him, drawing all inferences in his favor. After doing so, the University's interest in regulating his speech seems limited.

Take Porter's blog post. From his allegations, we can only identify two of the sixty doctoral students who expressed concerns with his blog post. Without more, it's hard to see how that post could have impeded the University's operations so much that it outweighed his interest in speaking freely about these matters of public concern (and the public's interest in hearing his views).

The same goes for Porter's other protected speech. Reading his complaint in a light most favorable to him, perhaps a single faculty member complained on the departmental climate survey about his faculty-meeting comment, while—a whole two years later—two of his colleagues were upset enough by his faculty-hiring email to forward it to Pasque. But occasional discord or even outright hostility among a few professors does not itself establish a strong governmental interest. *Cf. Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.").

That is especially true in the context of a university, where disagreement between professors should be the norm.

Against whatever governmental interest we can glean from this record, we must weigh Porter's and the public's interest in his speech. Again, the university setting forms the stage on which we perform this balancing. And, at the university, the scales are tipped in favor of more speech: "Our Nation is deeply committed to safeguarding academic freedom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

Why? Because the freedom for professors to discuss or investigate controversial problems without interference or penalty plays a "vital role in [our] democracy." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality). "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). A robust marketplace of ideas in our society requires an even more robust marketplace in our schools. *See Adler v. Bd. of Educ.*, 342 U.S. 485, 508 (1952) (Douglas, J., dissenting) ("The Constitution guarantees freedom of thought and expression to everyone in our society. All are entitled to it; and none needs it more than the teacher. The public school is in most respects the cradle of our democracy.").[8] And professors have valuable perspectives on how a

---

[8] This principle—that a democratic society requires schools to foster a robust debate of controversial views—is deeply woven into our civilizational fabric. *See* University of Chicago, *Report of the Committee on Freedom of Expression* (2015) ("[W]ithout a vibrant commitment to free and open inquiry, a university ceases to be a university."); Letter from Thomas Jefferson to William Roscoe (Dec. 27, 1820), in 15 *The Writings of Thomas Jefferson* 302, 303 (Andrew A. Lipscomb & Albert Ellery Bergh eds., 1904) (The University of Virginia would be founded on "the illimitable freedom of the human mind. (Continued)

41

university should foster that marketplace. *See Pickering*, 391 U.S. at 571–72 (noting that teachers are likely to have informed opinions about school operations). While discovery may shed light on how these constitutional truths apply to Porter and his specific university, Porter has surely alleged a weighty interest in his speech.

Accordingly, the University must do more to show, in this instance, that its interests justified silencing Porter's concerns. Discovery might produce evidence to show just that.[9] "But on this record"—at this nascent stage of litigation—"we cannot yet tell." *Sharpe*, 59 F.4th at 682; *see also Ridpath*, 447 F.3d at 318; *McVey*, 157 F.3d at 279. Porter's claims should thus proceed.[10]

*     *     *

"Flaws are not always best laid bare by pallid speech." *Manning v. Caldwell*, 930 F.3d 264, 305 (4th Cir. 2019) (en banc) (Wilkinson, J., dissenting specially). While "civil

---

For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left free to combat it."); Plato, *The Apology, in Dialogues of Plato* 342–68 (Aldine ed., B. Jowett trans., 1898) (Socrates defending his right to discuss controversial topics with students).

[9] For example, the University might demonstrate its strong interest in collegiality and harmony by showing that it has fired all professors who used profanity or sarcasm. In contrast, the evidence might show that any claimed reliance on collegiality is pretextual. But, in the end, the University bears the burden of showing that Porter's speech so disrupted its operations and mission that it justifies infringing on the weighty First Amendment interests in Porter's speech.

[10] A note on remedies. The district court held, in the alternative, that Porter's claims for damages against the University's administrators in their personal capacities were barred by qualified immunity, because—even if their actions violated the First Amendment—any violation was not "clearly established." J.A. 51–52. Perhaps. *But see Adams*, 640 F.3d at 566. But, either way, that would not dispose of his case, because Porter also sued for injunctive relief, which is "prospective" under *Ex parte Young*, 209 U.S. 123 (1908).

discourse is often the best antidote to a coarsening culture," civility's dictates "may also be used as a censoring mechanism to drain and dilute dissenting voices." *Id.* For those who disagree with Stephen Porter's message, he might indeed sound like an unpleasant agitator, disturbing the peace. But transgressions of tone tend to ring loudest when we disagree with the speaker's views.

 Our job, however, is not to appraise the value of Porter's speech or his personal virtue. It's to take the facts as alleged in the complaint, read them in a light most favorable to Porter, and then decide whether he's plausibly stated a claim for relief. And, drawing all reasonable inferences in Porter's favor, the University threatened his tenure by removing him from his program area because of his protected speech. The University has not yet produced evidence to justify its decision. And no such evidence springs forth from the face of the complaint. So Porter's claims ought to survive, and the district court's contrary decision ought to be reversed. This is not a close call.

My friends in the majority apparently seek to return to the days of Justice Holmes. But only for certain plaintiffs. In doing so, they have developed a new "bad man" theory of the law: identify the bad man; he loses. *But see* Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457 (1897). The majority's threadbare analysis willfully abandons both our precedent and the facts in search of its desired result. Even for a Holmesian, that cynicism breaks new ground.

I thus respectfully dissent.